**TIMBER ACCESS INDUSTRIES CO., INC.**

v.

**The UNITED STATES.**

No. 180–75.

United States Court of Claims.

April 20, 1977.

James R. Moore, Portland, Or., attorney of record, for plaintiff. Neva T. Campbell, Milwaukee, Wis., of counsel.

R. W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before DAVIS, KASHIWA, and KUNZIG, Judges.

## ON PLAINTIFF'S AND DEFENDANT'S CROSS–MOTIONS FOR SUMMARY JUDGMENT

KUNZIG, Judge.

■ This case, involving extensions of timber sale contracts entered into between plaintiff-purchaser, Timber Access Industries Company, Inc. (Timber Access), and the United States Forest Service (Forest Service) is before the court on cross-motions for summary judgment. Two issues are presented. The primary one concerns interpretation of contract rate redeterminations for unscheduled extensions. The second (and subsidiary) issue involves administrative procedure. Our standard of review is established by the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970),[1] as this case comes before the court following a determination by the Department of Agriculture Board of Forest Appeals (Board) adverse to plaintiff.

We hold for defendant on the main issue of contract interpretation and, therefore, as explained *infra*, do not find it necessary to reach any subsidiary procedural questions.

Timber Access was awarded two contracts for the sale of timber; the "Horse

---

**1.** The Wunderlich Act provides:

41 U.S.C. § 321 (1970). *Limitation on pleading contract provisions relating to finality; standards of review.*

No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent (footnote omitted) or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

41 U.S.C. § 322 (1970). *Contract-provisions making decisions final on questions of law.*

No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

Creek" contract on July 6, 1966, and the "Failor Ridge" contract on July 3, 1969. Both involved timber located in the Forest Service Pacific Northwest Region. The price to plaintiff for each contract included a "bid premium," an amount in excess of the Forest Service appraised value which plaintiff was willing to pay for the right to cut and to remove timber.

Each contract provided (in exactly the same terms) for extending time of performance and for adjusting the contract price for the extension period. The contract clause providing for rate redetermination in conjunction with a contract extension reads, in pertinent part, as follows:

> [R]ate redeterminations shall be made in accordance with the *standard method* in use at the time of rate redetermination and shall consider all facts which may affect timber value at the rate redetermination date. Contract Para. B3.31. (emphasis supplied)

As explained *infra,* the contracts at issue here were extended several times. Each time the Forest Service used the *standard method* in calculating the redetermined rates. To the Forest Service, the standard method was that set forth in the Forest Service Manual. In cases such as this, the method was applied by the Forest Service in the following way: First, the remaining timber was reappraised based on the "sale as a whole," that is as if the original stand of timber remained uncut. Timber industry data in effect 45 days before the expiration date of the contract was applied to determine the reappraised value. The bid premium from the original award was then added to the reappraised value, giving the redetermined rate. Only if the redetermined rates were higher than the current contract rates did the redetermined rates take effect.

The "Horse Creek" contract was extended four times. Each extension involved an increase in the contract price. (That is the redetermined rates were higher than the then-current contract rates, so the redetermined rates went into effect.) All of the rate redeterminations were computed according to the standard method, as set forth in the Forest Service Manual (outlined, *supra* ). Plaintiff accepted the first two without objection.[2] The last two, executed on August 10, 1972 and August 17, 1973 are contested. Timber Access accepted the August 10 extension under protest and appealed the price redetermination to the Board. The appeal was denied (Bd. No. 299). The August 17 extension was also accepted under protest, but no appeal was taken.

In denying plaintiff's appeal from the August 10, 1972 rate redetermination, the Board held that the Forest Service properly based the redetermination on the "sale as a whole," as if no timber had been cut, and held that the original bid premium was properly added to the reappraised timber value. Plaintiff challenges the Board's "Horse Creek" decision (No. 299) in this court and contests the August 17, 1973 rate redetermination, even though the Board did not pass on the 1973 redetermination.

The "Failor Ridge" contract was also extended with an increase in price following a rate redetermination. After preliminary negotiations with regard to this extension, the Forest Service, on December 11, 1972, advised plaintiff that it must either sign the proposed extension (which included a redetermined price based on reappraisal plus original bid premium), or allow the contract to expire. Plaintiff agreed to the extension under protest by letter of December 18, 1972. In this letter, plaintiff reserved its right to appeal. However, an appeal was not filed with the Regional Forrester until January 23, 1973. The Regional

2. Plaintiff argues that the court should not attach any weight to its acceptance, without protest, of the first two redeterminations. Plaintiff's position is based on the claim that the two redeterminations were not before the Board and are not, therefore, part of the administrative record. While we are in-

clined to agree with plaintiff, *United States v. Carlo Bianchi & Co., Inc.,* 373 U.S. 709, 714, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), we do not decide this question because we do not consider the first two redeterminations in reaching our conclusion.

Forrester found December 11, 1972 the effective date of the contract extension and January 23, 1973 the date of the appeal. He then denied the appeal as not taken within the 30-day limit. Plaintiff appealed the Regional Forrester's determination to the Board.

In case number 320, the Board upheld the Regional Forrester's "Failor Ridge" decision. The 30 days runs, the Board said, from the date of receipt of a final decision (December 11, 1972) by a Forest Officer, 36 C.F.R. 211.30(a) (1972), not from the date the new rates become effective (January 1, 1973). Plaintiff also challenges the Board's "Failor Ridge" decision before this court.

Timber Access argues that the Boards in both the "Horse Creek" and "Failor Ridge" cases reached erroneous conclusions of law. Concerning the "Horse Creek" case, plaintiff contends that the Board incorrectly interpreted the contract. Price redeterminations made in conjunction with contract extensions, plaintiff states, should be made on the basis of the timber remaining at the time of the redetermination, not on the basis of the "sale as a whole." In support of its interpretation, plaintiff argues that the Forest Service Manual guidelines for price redeterminations are not binding on plaintiff for they do not conform to the contract and are not published in the Federal Register. In addition, plaintiff claims that the inclusion of the bid premium in the rate redetermination process constitutes the application of an illegal penalty against plaintiff and should, thereby, be disallowed.

With regard to the "Failor Ridge" Board opinion, plaintiff again contends that the Board reached an erroneous conclusion of law. Plaintiff claims, contrary to the Board's decision, that its appeal was timely. Further, plaintiff contends that even if not timely, its failure to exhaust administrative remedies with regard to both the extension of the "Failor Ridge" contract and the August 17, 1973 extension of the "Horse Creek" contract should be excused due to inadequacy of administrative remedies. *See Anthony Grace & Sons, Inc. v. United States,* 170 Ct.Cl. 688, 695, 345 F.2d 808, 812

(1965), *rev'd on other grounds,* 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

Defendant replies that the Board decisions in both the "Horse Creek" and the "Failor Ridge" appeals were correct. In "Horse Creek," defendant argues, the Board properly held that the standard method for price redetermination should apply, that this method is set forth completely in the Forest Service Manual, and that plaintiff is bound by this method.

In response to plaintiff's positions concerning the "Failor Ridge" decision, defendant urges that plaintiff's appeal in the "Failor Ridge" contract was not timely and that plaintiff is barred from contesting the August 17, 1973 contract extension due to plaintiff's failure to exhaust its administrative remedies.

We hold for the Government.

■ Before we begin our discussion of the parties' arguments, a word on the scope of the court's review is in order. This is a Wunderlich Act case (*see* note 1, *supra*); therefore, our review is limited. However, when the questions for review are those of law, as in this case, the court has the duty independently to review the decision of the administrative board which first passed on the issues. *Anthony Grace & Sons, Inc. v. United States, supra* 170 Ct.Cl. at 695, 345 F.2d at 811–12; *Wingate Construction Co. v. United States,* 164 Ct.Cl. 131 (1964); *Beacon Construction Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501 (1963); *P.L.S. Coat & Suit Corp. v. United States,* 148 Ct.Cl. 296, 180 F.Supp. 400 (1960).

### 1. *CONTRACT INTERPRETATION*

Plaintiff first contends that the contract alone controls the method of price redetermination and that this method results in a price based solely on the reappraisal value of the *remaining* timber. Defendant, of course, argues that the redetermined price is based on a reappraisal of the sale as a whole, plus the bid premium, as outlined in the Forest Service Manual which applies, claims defendant, by the terms of the contract.

#### a. Sale as a Whole

Our first task then is to determine whether the Forest Service Manual should be read into the contract. We begin our inquiry with the applicable contract language:

B3.31 *Rate Redetermination Method*

\* \* \* \* \* \*

[R]ate redeterminations shall be made in accordance with the *standard method in use at the time of the rate redetermination* and shall consider all factors which may affect timber value at the rate redetermination date. (emphasis supplied)

\* \* \* \* \* \*

 The term *standard method* has become, so to speak, "trade usage" for those engaged in contracting with the Forest Service. The knowledgeable contractor should

**3.** The Forest Service Manual provides, in pertinent part:

FSM § 2427.35
Rate Redetermination When Contract Period is Extended. If the contract is extended at the request of the purchaser a rate redetermination will be made either for the timber on the 'sale as a whole' or for the timber to be cut during the ensuing period depending upon the wording in A7 of the contract for sales with scheduled rate redetermination provision. For sales without scheduled rate redeterminations, extension rate redeterminations will be based on the sale as a whole.

1. The rate redetermination will be made as though the sale were a new sale being originally appraised, using the standard Forest Service appraisal method and data in effect 45 days prior to the expiration date. If the weighted average redetermined rates plus the weighted average bid premium rates on the volume remaining are greater than the weighted average current contract rates in effect immediately prior to the extension they will be placed in effect. Otherwise the rates in effect at time of extension will remain in effect. The proportion by species of the remaining volume can be the deciding factor in determining whether weighted average value of redetermined rates plus bid premium is higher than the weighted value of current contract rates applied to the remaining volume. For this reason a reliable estimate of the remaining volume by species should be made. The established rates for any species-product cannot be less than the current contract rate. Therefore, appraised rates

understand the language and if plaintiff (Timber Access) did not, it was nevertheless charged with making itself aware of the usage. *General Builders Supply Co., Inc. v. United States,* 187 Ct.Cl. 477, 484, 409 F.2d 246, 251 (1969).

The *standard method,* known to all contractors, is that set forth in the Forest Service Manual.[3] It is the same method which has been given wide publicity since 1965 and has been used on 250 contract extensions in the Willamette National Forest (the site of the timber covered by this contract) and in thousands of other Forest Service sales.

Yet plaintiff claims that it is not bound by the standard method because the Forest Service Manual was not published in the Timber Regulations (36 C.F.R. 221.1 *et seq.*) or elsewhere in the Federal Register. Sub-

for some species may need to be adjusted downward to compensate for establishing current contract rates for those species-products which appraise below current contract rates, in order that the redetermined plus bid premium value of the remaining timber will not be changed. \* \* \*

FSM § 2453.31b
Rates After Scheduled or Emergency Rate Redetermination (B3.12). After a scheduled or emergency rate redetermination, the current contract rate for material not subject to escalation is the redetermined rate plus the bid premium rate. For material subject to escalation, the tentative rate is the redetermined rate plus the bid premium rate, and the current contract rate is this tentative rate adjusted by escalation. The bid premium is constant for the life of the contract and, hence, is added to the redetermined rate.

FSM § 2453.31e
Rates When Contract Term is Extended (B3.15). This subsection outlines the procedure which will be applied when the purchaser applies for a contract extension. Such contract extension automatically establishes a rate redetermination date effective on the date of the beginning of the contract extension. Such rate redetermination, however, is subject to a floor which is the rate in effect immediately prior to the date of the contract extension. This is a simple concept in connection with flat rates. Where escalation is involved, the rate redetermination will establish a new base index. \* \* \*

stantive rules of the Forest Service are required to be published in the Federal Register, 5 U.S.C. § 552(a)(1)(D) (1970),[4] and ordinarily a rule cannot bind or adversely affect a person absent publication.

■ However, 5 U.S.C. § 552(a)(1) provides an exception to this general rule. Even if a matter is not published in the Federal Register, a person is still bound if he has "actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(1) (1970). In the case before the court, plaintiff comes within the exception. The record clearly shows that plaintiff had knowledge of the Forest Service Manual. During the course of negotiations preceding the contract modification, plaintiff in fact quoted part of the Manual to the Forest Service.

■ In addition, the contract itself invites the contractor to search out the meaning of *standard method. Cf. Bergen v. United States,* Ct.Cl., also decided this day, at note 3. Clause B3.15 directs the Forest Service to make rate redeterminations pursuant to clause B3.31, *supra.* Clause B3.31 refers specifically to the "standard method in use," but nowhere in the contract is the standard method defined. Since the Forest Service is limited to only the use of the *standard method,* it seems naive that plaintiff would read the contract without inquiring as to the meaning of this obviously important term. Just slight inquiry would have brought forth the information that *standard method* is a term of art. *See General Builders Supply Co., Inc., supra,* 187 Ct.Cl. at 484–85, 409 F.2d at 251; *Beacon Construction Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501 (1963). *Cf. Space Corp. v. United States,* 200 Ct.Cl. 1, 470 F.2d 536 (1972).

■ Plaintiff, however, does not rest only on his claim that the Forest Service Manual does not apply because it was not published in the Federal Register. Timber Access also argues that it should not apply

because the Manual is inconsistent with the contract and, in view of this alleged inconsistency, the contract should control. Plaintiff misses the point. The contract and the Forest Service Manual are not inconsistent, but are complementary. Read together, they form a comprehensive rate redetermination scheme, and direct that the timber be reappraised on the basis of the "sale as a whole."

■ The contract requires the Forest Service, in determining extension rates, to take into consideration "all factors which may affect timber value at the rate determination date." Contract clause B3.31. This refers to market forces in the base index for timber prices, inflation, and to costs involved in the harvesting of timber.

The Forest Service Manual states that: ". . . for sales without scheduled rate redeterminations [such as is involved in this case], extension rate redeterminations will be based on the *sale as a whole.* The rate redetermination will be made as though the sale were a *new sale being originally appraised,* using the standard Forest Service appraisal method and the data in effect 45 days prior to the expiration date. FSM § 2427.35, *supra* note 3." (emphasis supplied)

This language illustrates that the redetermination is conducted as if the original timber stand remains unchanged. To this reappraisal are then added the factors (data) referred to in the contract as of the date specified in the Forest Service Manual.

To read the contract otherwise would leave the vital term "standard method" without meaning. Such a reading is to be avoided whenever possible in favor of one that gives

. . . reasonable meaning to all parts of the instrument rather than leaving a portion of it useless. [*ITT Arctic Services, Inc. v. United States,* 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975)]

---

4. 5 U.S.C. § 552(a)(1) (1970):

Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency . . .

**1256**

*See also, C. H. Leavell & Co. v. United States,* 208 Ct.Cl. 776, 800–01, 530 F.2d 878, 891–92 (1976).

The complementary scheme we have outlined avoids such a situation. All parts of the contract are given a reasonable interpretation and a place in the rate redetermination process. Both parties to the contract are able, from the date of contracting, to ascertain future dealings under the contract with certainty.

■ Further, reading the contract and the Forest Service Manual as complementary fosters the doctrine of contract interpretation that words are to be given their plain and ordinary meanings.[5] *See Whelan v. United States,* 208 Ct.Cl. 688, 693, 529 F.2d 1000, 1002–03 (1976); *ITT Arctic Services, Inc. v. United States, supra,* 207 Ct.Cl. at 752, 524 F.2d at 684; *Victory Construction Co. v. United States,* 206 Ct.Cl. 274, 287, 510 F.2d 1379, 1386 (1975).

Thus the plain meaning of the language used plus the complementary relationship of the contract and Manual show clearly that the "sale as a whole" is the proper method by which to reappraise the timber. In addition, the common sense and logic of such an interpretation is made even more evident by the obvious opportunity for "game playing" under plaintiff's view.

Essentially, plaintiff is urging that the Forest Service, each time a contract is extended, conduct a new "cruise" of the timber to determine the type, size, location, and quality of it. Plaintiff contends that the result of the new cruise would be a lower reappraisal value, and hence, a lower redetermined rate. But the drawbacks to such a procedure are great. First, the cost to the Forest Service would be substantial. Second, a contractor could, through selective cutting, greatly affect any subsequent appraisal thereby reaping high profits and denying the Government a fair price for the timber. He could, for example, harvest the readily accessible above-average timber during the initial term of the contract, thereby keeping his costs down, his selling price high, and maximizing his profits. Then, in negotiating the contract extension, he could argue for a low reappraisal based on the inaccessible and poorer quality timber remaining. This would again allow him to maximize his profits for, even though he would have higher costs and would be receiving less for his timber, he would also be paying the Government less.

We hold that the Forest Service Manual applies to this contract, and that FSM § 2427.35 requires that reappraisals be based on the "sale as a whole" as though the sale were a "new sale being originally appraised."

### b. Bid Premium

The remaining contract issue concerns plaintiff's claim that the addition of the bid premium to the reappraised value of the timber is a penalty and therefore void. We begin by pointing out that the addition of the bid premium to the reappraised value of the timber is clearly required by the contract (clause B3.12), and it was on this point that the Board of Forest Appeals rested its decision. However, a finding that the addition of the bid premium is required by the contract does not end our inquiry. It could still be a penalty, and void.

■ Plaintiff argues the bid premium is a penalty because it bears no relationship to the fair market value of the timber. For support of this proposition, plaintiff relies *In re Idaho Timber Co.,* D.C. Plaintiff is in error. The bid premium *does* relate to the market value. At the time the contract was originally entered into, the bid premium reflected the amount by which a purchaser's bid exceeded the original appraised market value. Adding the bid premium to the reappraised market value in calculating the redetermined rate simply maintains (albeit approximately) the relationship that the bid premium had to

5. We note here that plaintiff's *contra proferentem* argument is without merit. For the rule to apply, and the contract to be construed against the drafter (here, the Government) the contract must be ambiguous. In the instant case, the contract is clear. *See, e.g., S. W. Aircraft Inc. v. United States,* Ct.Cl., 551 F.2d 1208 (1977).

the appraised market value at the time of the award.[6]

To hold that the bid premium should never be included, as plaintiff requests, would allow a contractor to do minimal harvesting of timber during the original contract period, then, during the extension period, to cut great amounts of timber reaping a large profit while free from the cost imposed on him by the bid premium. This we cannot condone. After all, plaintiff originally bid the higher figure, including the bid premium, in order to win the contract. The inclusion, now, of the bid premium in the redetermined rates *is the price plaintiff must pay for being allowed to extend a contract without having to fight competition to successfully rebid.*

The case plaintiff cites, *Idaho Timber Co., supra,* is not controlling. The *Idaho Timber* decision prevents the Forest Service from measuring damages for breach of a timber sale contract by the difference between the original bid premium and a higher bid premium received by the Forest Service on resale. That is clearly a different situation from the instant case, which involves not the permissible method of calculating damages, but the proper method of rate redetermination.

Thus, in the instant case, we are left with the original contract provisions. They require payment of a bid premium, and we so hold.

To summarize *part 1,* the Forest Service Manual must be read into the contract. Even though the Manual's terms are not published in the Federal Register, Timber Access is bound by these terms due to its knowledge of the Manual. The contract and Manual, read together, provide a comprehensive scheme for calculating rate redeterminations. This scheme requires that the reappraisal be based on the "sale as a whole" and that the bid premium be added to the reappraisal value in arriving at the redetermined rate.

## 2. PROCEDURAL QUESTIONS

 Plaintiff challenges the denial of its appeal in "Failor Ridge." The Board, finding the appeal untimely, had denied it. We agree with the Board's result, although reaching the same conclusion, as a matter of law, by a different route. *See Federal Electric Corp. v. United States,* 202 Ct.Cl. 1028, 1040, 486 F.2d 1377, 1383 (1973) *cert. denied,* 419 U.S. 874, 95 S.Ct. 136, 42 L.Ed.2d 113 (1974); *Maxwell Dynamometer Co. v. United States,* 181 Ct.Cl. 607, 631, 386 F.2d 855, 870 (1967). Because the issues presented by the merits of "Failor Ridge" are the same as those correctly decided by the Board in "Horse Creek," plaintiff's procedural arguments are moot.

A final issue remains: whether plaintiff's failure to exhaust its administrative remedies concerning the August 17, 1973 extension of the Horse Creek contract bars the court from considering the merits of plaintiff's appeal. *See Anthony Grace & Sons, Inc. v. United States, supra.* Assuming, *arguendo,* that plaintiff's claim is not barred, we reach the same result as in "Horse Creek" (part 1, *supra*); plaintiff fails on the merits. Therefore, plaintiff's "failure of administrative remedies" argument is also moot.

In light of the foregoing, we conclude that the Board's decisions in favor of the Government withstand Wunderlich review. Plaintiff has not shown legal error in either the "Horse Creek" or "Failor Ridge" Board decision.

Accordingly, after consideration of the briefs and record, and after hearing oral argument, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

---

**6.** Following plaintiff's argument to its logical conclusion, it would appear to work to his decided disadvantage. If, to be allowable, the bid premium must have an exact relationship to market value, then perhaps the Government would have the right to add an amount to the bid premium in order to maintain an exact relationship between the bid premium and the reappraised market value (assuming that the reappraised value as in the instant case is higher than the original appraisal).