**SOUTH & HEADLEY
ASSOCIATES, LTD.**

v.

**The UNITED STATES.**

**No. 666–83C.**

United States Claims Court.

July 2, 1985.

Lawrence S. Berger, Morristown, N.J., for plaintiff.

Sharon Y. Eubanks, Washington, D.C., with whom were Acting Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WHITE, Senior Judge.

Plaintiff, South & Headley Associates, Ltd., is the present owner of a building located at 237 South Street, Morristown, New Jersey (the building), in which the Federal Government occupied space for

several years after September 22, 1975, under lease No. GS–02B–18594 (the lease), as extended. In this action, the plaintiff sues under the Tucker Act (28 U.S.C. § 1491(a)(1) (1982)) for additional amounts (over and above the annual rental payments provided for in the lease) allegedly due in accordance with the tax escalation clause, the operating costs escalation clause, and the overtime services clause of the lease.

The case is before the court on the defendant's motion for summary judgment, the plaintiff's response to the motion, and the defendant's reply. Oral arguments by counsel on the motion have been heard.

The granting of a motion for summary judgment is appropriate when—and only when—the papers before the court show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. RUSCC 56(c).

### Undisputed Facts

The lease in question was entered into between the then owner of the building, Hyland Associates, and the United States (represented by a contracting officer of the General Services Administration) under the date of December 17, 1975, for an original term that began retroactively on September 22, 1975, and extended through September 30, 1980. The lease covered "[a]pproximately 8,290 net usable square feet of first floor office space in the building," for which the Government agreed to pay an annual rent of $73,149.

The lease provided that it might be renewed, at the option of the Government, for an additional period of 5 years at an annual rental rate of $84,280.65, "plus escalation for taxes and operating costs" in accordance with escalation clauses which were attached to the lease. In accordance with this option, the Government renewed the lease for an additional 5–year term

beginning October 1, 1980, and ending September 30, 1985.[1]

The tax escalation clause of the lease was effective as of October 1, 1980; and it provided in part as follows:

At the end of the first 5 year(s) of Government occupancy under the lease, the annual rate will be adjusted to provide for increases or decreases in general real estate taxes. *The tax adjustment shall be based on the percentage of the building occupied by the Government.* * * *

The base from which upward or downward adjustments in the rent will be made shall be the "per net usable square foot" costs as above provided or as amended for each five-year period. * *

* * * * * *

The percentage of the building occupied by the Government is 32%. The basis from which any adjustment for taxes shall be made is $12,113.28. [Emphasis supplied.]

The escalation clause of the lease relative to operating costs also became effective as of October 1, 1980; and it provided in part as follows:

At the end of the first 5 years, of Government occupancy, the annual rental rate will be adjusted * * * to provide for decreases or increases in the operating costs * * * furnished by the lessor in and to the Government's leased area as a part of the rental consideration, excluding exterior and structural maintenance and repair, window cleaning, lawn and landscaping maintenance and snow removal. * * * The base from which upward or downward adjustments in the rent will be made shall be the "per net usable square foot" costs as above provided or as amended for each five-year period. * * *

* * * * * *

The base cost of services for the first year of this lease is $1.35 per net usable square foot.

The lease also contained a provision on the subject of "Overtime Services," reading in part as follows:

(1) The Government shall have access to the leased premises and the right to use the space beyond normal working hours specified above, and on Saturdays, Sundays, and Federal holidays including the use of elevators, toilet facilities, chilled drinking water and electricity for lights and operation of small office and business machines (such as electric typewriters, addign [sic] machines, calculators, etc.) without additional payment. If janitorial services, heat and/or airconditioning are required by the Government on an overtime basis beyond the above specified hours, they will be furnished by the Lessor upon the Government's request and payment to the Lessor for such additional serives [sic] will be made at The [sic] rate of $7.00 per hour.

(2) Upon presentation of a properly certified invoice, payment will be made by the Government for services requested and received.

On December 29, 1982, which was during the extended period of the lease, the original lessor, Hyland Associates, conveyed the building to the plaintiff.

### The Tax Escalation Claim

■ In a letter which the plaintiff wrote to the General Services Administration under the date of February 11, 1983, the plaintiff asserted that the Government was liable for additional rent under the tax escalation clause because, according to the plaintiff, the percentage of the building occupied by the Government had increased from 32 percent to 50 percent.

The plaintiff's claim for an increase in the rent under the tax escalation clause of the lease was denied by Joseph W. Siegel, the contracting officer, in a letter to the

---

1.  It was disclosed at the oral argument that the Government no longer occupies any space in the building.

plaintiff dated August 22, 1983. The contracting officer took the position that the percentage of the building space occupied by the Government had not exceeded 32 percent at any time.

As indicated in the statement of undisputed facts, the tax escalation clause of the lease provided that on and after October 1, 1980, the annual rental rate provided for in the lease should "be adjusted to provide for increases or decreases in general real estate taxes" on the building, and that the tax adjustment should "be based on the percentage of the building occupied by the Government," with $12,113.28 to be used as the base in determining the extent of any rent increase or decrease. The figure of $12,113.28 represented 32 percent of the amount ($37,874) of the real estate taxes on the building for 1975, the year when the Government's occupancy of the building began.

The building consists of a lower level and an upper level. At the time when the GSA and the then owner of the building entered into the lease agreement, all of the usable space in the building, including the lower level, was being used as office space. The amount of space (8,290 square feet) used by the Government throughout the lease period represented 32 percent of the usable office space in the building when the Government's occupancy began in 1975.

In 1978, however, the Code Enforcement Office of the Township of Morristown, New Jersey, determined that the lower level of the building did not conform to the Township's requirements relative to adequate parking facilities. On the basis of this determination, the Township required the owner of the building to discontinue the use of the lower level for office purposes.

After the use of the lower level of the building for office purposes was discontinued in 1978 because of the action by the Township of Morristown, the Government continued to occupy and use the same space in the building, (8,290 square feet) that it had previously used, but the space occupied and used by the Government then represented 50 percent, rather than 32 per-

cent, of the usable office space in the building.

Following the loss of the use of the lower level for office purposes, the Township of Morristown, at the owner's request, reduced the assessed value of the building for tax purposes from the previous figure of $945,000 to $805,000, with the result that the taxes on the building for 1978 were reduced from the initial figure of $33,736.50 to $28,738.50. The assessed valuation for 1979 remained at $805,000, and the taxes for that year were $28,094. The contracting officer's letter of August 22, 1983, indicates that the real estate taxes on the building for 1980, which appears to be the period involved in the present action, amounted to $28,336.

The plaintiff contends that the adjustment of the annual rental to reflect increases or decreases in general real estate taxes on the building should be computed after October 1, 1980, on the occupancy by the Government of 50 percent of the *usable office space* in the building. The defendant, on the other hand, contends that the adjustment should be computed on the basis of the continued occupancy by the Government of 32 percent of the *usable space* in the building. The court, therefore, is required to determine the meaning of the phrase, "the percentage of the building occupied by the Government," as used in the tax escalation clause of the lease.

This court's predecessor, the United States Court of Claims, whose decisions are binding on this court (General Order No. 1, 1 Cl.Ct. XXI (1982)), relied on and applied the rule of contract interpretation that the words of a contract are to be given their plain and ordinary meanings (*e.g., Timber Access Industries Co. v. United States*, 213 Ct.Cl. 648, 658, 553 F.2d 1250, 1256 (1977); *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975)). In the present case, the crucial phrase, "the percentage of the building occupied by the Government," is composed of words having plain, everyday meanings. There is no ambiguity in the phrase that might possibly justify the court in constru-

ing it to mean the percentage of the *usable office space* in the building occupied by the Government, as proposed by the plaintiff.

Moreover, the tax escalation clause states that the base to be used in calculating rent adjustments under this clause shall be the "per net usable square foot" costs. The term "net usable space" is defined in section 2 of schedule D of the lease in relation to "gross inside area," with deductions for such things as toilets and lounges, stairwells, elevators and elevator shafts, etc.

The plaintiff states in its brief that it was the intention of the parties "to calculate the percentage of the building occupied by the Government in accordance with the percentage of *net usable* square feet of office space occupied by the Government" (emphasis in original). In this connection, a bare assertion in the plaintiff's response to the motion for summary judgment, unsupported by any sort of evidentiary material in the form of an affidavit or otherwise, does not have any probative value in determining what was the actual intent of the parties or whether the court should hear evidence relative to the intent of the parties. *See Ables v. United States*, 2 Cl.Ct. 494, 504 (1983), *aff'd*, 732 F.2d 166 (Fed.Cir. 1984). Although the plaintiff's response to the motion for summary judgment is supported by certain documentary materials, none of them purports to deal with the intentions of the parties when they inserted the tax escalation clause in the lease. In any event, "if the parties have made a memorial of their bargain * * *, the law does not recognize their will, or, as it is more frequently stated, their intent, unless it is expressed in, or may fairly be implied from, their writing" (4 WILLISTON ON CONTRACTS (3d ed.1961), § 600A, at 286).

The plaintiff's claim under the tax escalation clause of the lease must therefore be denied.

*The Operating Costs Escalation Claim*

At about the time when the plaintiff's letter of February 11, 1983, was written, a representative of the plaintiff orally raised with the contracting officer the issue of money allegedly due the plaintiff under the provision of the lease relative to the escalation of operating costs. The details of this conversation—or perhaps conversations—are not available in the present record. However, the contracting officer's letter of August 22, 1983—which was declared to be "the final decision of the Contracting Officer"—mentioned the operating costs escalation claim and its possible settlement as having been discussed with a representative of the plaintiff. Although the contracting officer did not specifically discuss the merits of this claim in the letter of August 22, 1983, his "final decision," by necessary implication, denied the plaintiff's operating costs escalation claim along with the tax escalation claim.

It is inferred from the contracting officer's letter of August 22, 1983, that there had been an increase in the plaintiff's operating costs, and that the controversy between the plaintiff and the Government concerning this aspect of the case did not involve any question as to whether, in fact, the operating costs had increased.

The operating costs escalation clause of the lease provides that "[t]he base from which upward or downward adjustments in the rent will be made shall be the 'per net usable square foot' costs * * * for each five-year period."

As stated earlier in the opinion, the term "net usable space" is defined in paragraph 2 of schedule D of the lease as relating to "the inside gross area of the space," deducting from the gross area such things as toilets and lounges, stairwells, elevators and escalator shafts, etc. This would not provide support for any contention by the plaintiff that it was entitled to an upward adjustment in the rental rate to reflect 50 percent of the increased operating costs, merely because the defendant, during the 5–year extension of the lease term, was occupying 50 percent of the *usable office space* in the building.

Nevertheless, if, as indicated in the contracting officer's letter of August 22, 1983,

there was an actual increase in the plaintiff's operating costs, the plaintiff would be entitled to an upward adjustment in the rental rate, on an appropriate basis, to reflect such increase.

■ In the defendant's initial brief supporting its motion for summary judgment, the defendant asserted that the plaintiff was not entitled to recover on the operating costs escalation claim because the plaintiff had failed to exhaust its administrative remedy with respect to this claim. At oral argument, however, defendant's counsel stated that the defendant was no longer relying on this contention as a defense.

In this connection, it is noted that the controversy between the parties concerning this claim seemingly involves the proper construction of the operating costs escalation clause of the lease. This is a legal question (see *Astro-Space Laboratories, Inc. v. United States,* 200 Ct.Cl. 282, 292–93, 470 F.2d 1003, 1008 (1972); *Martin Lane Co. v. United States,* 193 Ct.Cl. 203, 206–07, 432 F.2d 1013, 1015 (1970)).

The only administrative remedy which the Tucker Act, as supplemented by the Wunderlich Act (41 U.S.C. §§ 321, 322 (1982)) and the "Disputes" clause of the lease, required the plaintiff to pursue related to "any dispute concerning a question of fact." Such a dispute had to be submitted to the contracting officer, whose decision was final and conclusive unless a timely appeal was taken to the head of the agency (or his duly authorized representative). The decision on an appeal was final and conclusive, except that judicial review could be obtained to determine whether, on the basis of the administrative record (see *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963)), the administrative decision was fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or was not supported by substantial evidence.

It was not necessary, therefore, that the purely legal dispute in this case between the parties concerning the proper interpretation of the operating costs escalation clause of the lease be presented to the contracting officer for decision.

■ The defendant's current argument in support of its motion for a summary judgment as to the plaintiff's claim under the operating costs escalation clause of the lease seems to be that there was no increase in the net usable space occupied and used by the Government during the 5-year extension of the lease, as compared to the net usable space occupied and used by the Government during the initial term of the lease; and, because there was no increase in the space leased by the Government, the plaintiff is not entitled to an adjustment under the operating costs escalation clause of the lease.

A proper reading of the operating costs escalation clause of the lease, however, reveals that the upward or downward adjustment in the rental rate provided for in that clause was not dependent upon whether the space occupied and used by the Government increased or decreased, but, rather, upon whether there were "decreases or increases in the operating costs * * * furnished by the lessor in and to the Government's leased area * * *, excluding exterior and structural maintenance and repair, window cleaning, lawn and landscaping maintenance and snow removal."

It appears, therefore, that the defendant is not entitled as a matter of law to a judgment on this aspect of the case. Instead, it will be necessary to hold a trial for the purpose of determining whether (as inferred from the contracting officer's letter of August 22, 1983) the plaintiff's operating costs for services furnished to the Government's leased area during the extended period of the lease increased, the amount of such increase (if any), and the amount (if any) of the upward rental adjustment properly due the plaintiff.

### The Overtime Services Claim

■ The plaintiff's first amended complaint, count three, alleges in general language "that the defendant has continuous-

ly utilized the premises beyond normal working hours," and that, despite repeated demands for payment by the plaintiff, "Defendant has failed to reimburse Plaintiff for any additional costs incurred by the Plaintiff due to Defendants [sic] overtime use of the Premises."

The defendant's brief in support of its motion for summary judgment asserts that the plaintiff did not raise before the contracting officer its claim relating to further payment for additional services, and that this failure to exhaust an administrative remedy prevents the court from exercising its jurisdiction over this claim under the Tucker Act.

The plaintiff attached to its response to the pending motion for summary judgment a document entitled "Certification," signed by a partner in the firm. This document states that, in dealing with the contracting officer, the person signing the certificate "raised" with the contracting officer the issue "of monies due for * * * overtime use of the Premises." The document does not explain in what form or manner the matter was "raised" with the contracting officer.

Thus, it appears that there is a dispute between the parties as to whether the plaintiff did or did not submit to the contracting officer a proper claim under the overtime services clause of the lease. For reasons previously stated, the Tucker Act, as supplemented, required that a proper claim be submitted to the contracting officer, inasmuch as the determination of the claim involved issues of fact as to whether the Government did or did not use the rented space beyond normal working hours on customary workdays, or on Saturdays, Sundays, or federal holidays, and, if so, the extent of such overtime use.

Because of the uncertainty as to whether the plaintiff did or did not submit a proper claim for overtime services to the contracting officer, the defendant is not entitled as a matter of law to a judgment on this claim.

### Conclusion

For the reasons previously stated in this order, it is concluded that the defendant is entitled to a judgment as a matter of law on count one of the amended complaint, dealing with the plaintiff's tax escalation claim, but is not entitled as a matter of law to a judgment on counts two and three of the amended complaint, dealing with the plaintiff's operating costs escalation claim and its overtime services claim, respectively.

The defendant's motion for summary judgment is denied, but the amended complaint will ultimately be dismissed as to the tax escalation claim after the proceedings relative to counts two and three of the complaint shall have been concluded.

IT IS SO ORDERED.