**GENERAL BUILDERS SUPPLY CO., Inc., on Behalf of Itself and for the Benefit of Hupp, Inc.**

v.

**The UNITED STATES.**

No. 188–68.

United States Court of Claims.

April 11, 1969.

Allen A. Sperling, Washington, D. C., attorney of record, for plaintiff.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant. R. W. Koskinen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

General Builders Supply Co., Inc., the plaintiff, made a contract in 1964 with the General Services Administration to furnish 7,859 refrigerators, for use in Germany, at $119 each. General Builders then subcontracted to purchase these articles from the Gibson Refrigerator Division of the Hupp Corporation, at $116. Hupp built pre-production models and submitted them for inspection to the Government, which rejected them three times. The contract was then terminated for default on the ground that the pre-production models failed to meet the specifications. No production refrigerators were made or delivered.

On appeal, the Board of Contract Appeals of the General Services Administration determined that the work had been improperly terminated for default.[1] The case was returned to the contracting officer for calculation of the recovery for

---

1. As we understand the Board's opinion, it did not find any bad faith on the part of the contracting officer, but merely that he erred, particularly "in failing to continue to consider trade practice, customs, and interpretation of terms of reference".

the erroneous termination. General Builders made claim, not only for the costs actually incurred before termination, but also for the anticipated profits said to have been lost by plaintiff and by Hupp. These amounted, plaintiff said, to more than $23,500 for itself and slightly over $102,400 for the subcontractor. The contracting officer allowed recovery of $6,491.77, for the costs,[2] but denied the demand for unearned but anticipated profits. Plaintiff was satisfied with the cost computation but appealed the rejection of the profit. The Board of Contract Appeals affirmed, holding that the default clause in the contract did not permit the award of anticipatory gain. The suit in this court attacks that conclusion. Both parties have moved for summary judgment and there is no factual controversy bearing on the legal question of the Government's liability for such profits.

■ The contract's default article embodied a then new provision (paragraph 3(e)) which was first promulgated in 1962:

> If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued

pursuant to such clause. If, after notice of termination of this contract under the provisions of this clause it is determined for any reason that the Contractor was not in default under the provisions of this clause, and if this contract does not contain a clause providing for termination for convenience of the Government, the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly; failure to agree to any such adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes." (NOTE: This contract does not contain a termination for convenience clause. Accordingly, the first sentence of above paragraph (e) is inapplicable.)

The application of that provision is the over-all question, and, since plaintiff's agreement did not contain a convenience-termination article, the narrower issue is whether the phrase "the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly" precludes the award of unearned profits.[3]

It is plain as a pikestaff that this provision was deliberately formulated by the Government in order to by-pass this court's holding in Klein v. United States, 285 F.2d 778, 152 Ct.Cl. 8 (1961), that, under the older version of the standard default clause, a contractor could recover anticipatory profits if he was defaulted when he was not truly in default. So

2. The breakdown was as follows:
   (1) Reimbursement of the expenses incurred in the manufacture of two pre-production models _____ $3,048.77
   (2) Reimbursement of overhead on the pre-production models _____ 2,643.00
   (3) A reasonable attorney's fee for legal services in connection with the settlement _____ 800.00
                      $6,491.77

3. Plaintiff makes some argument that it should be allowed to sue for breach (as

in Klein v. United States, 285 F.2d 778, 152 Ct.Cl. 8 (1961)), apart from any remedy "under the contract", but the provision just quoted in the text is explicit that, where the contractor is improperly defaulted, his remedy is directly "under the contract." That being so, he cannot sue for breach. *Cf.* Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965); Nolan Bros., Inc. v. United States, 405 F.2d 1250, 186 Ct.Cl. 602, 608 (Jan. 1969); J. D. Hedin Constr. Co., Inc. v. United States, 408 F.2d 424, 429, 187 Ct.Cl. ——, —— (Mar. 1969).

much is said expressly in General Services Administration's FPR [Federal Procurement Regulations] Circular No. 25, dated July 25, 1962 (transmitting the revision of the Federal Procurement Regulations which incorporated the new clause). The circular stated (under the rubric of "Explanation of Changes"):

> The revision of the default clauses in Standard Forms 32 and 23A is intended to preclude further decisions adverse to the Government similar to the decision in the Court of Claims case of Klein v. United States (285 F.2d 778, Jan. 18, 1961). * * * The revised clauses provide specifically, where the Government has issued a notice of termination for default and such notice subsequently is found to have been issued erroneously, (1) that such termination will become a termination for convenience of the Government if the contract contains a "convenience" termination clause, and (2) that an equitable adjustment will be made to compensate the contractor for the erroneous termination if the contract does not contain such a "convenience" clause. Thus, administrative settlement procedures and *related measures of compensation* are provided in the contract *whenever* a termination for default is later determined to be erroneous" (emphasis added).

With this explicit statement, there can be no doubt of the Government's purpose to cut off the recovery of unearned gain. The reference to the "measures of compensation" "related" to "administrative settlement procedures" makes it absolutely clear that the GSA intended that substantive result.

The only open question is whether this subjective intent was effectively carried into that part of the new clause dealing with those contracts without any provision for a convenience-termination. Plaintiff argues that the normal contractor would not be put on notice by the critical words of the clause—"equitably adjusted to compensate for such termination"—that anticipated profits could not be paid on an erroneous default termina-

tion. It is also stressed that, in contrast, the convenience-termination article spells out just that result in its formula for compensation, but that this contractor was told that its agreement was not to be controlled by the convenience-termination formula.

The concept of an "equitable adjustment" has had a long history in federal procurement, going back for about fifty years. See United States v. Callahan Walker Constr. Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49 (1942); United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L. Ed. 53 (1942); Ribakoff, Equitable Adjustments Under Government Contracts, in Government Contracts Program, The George Washington University, Changes and Changed Conditions 26, 27 (Gov't Contracts Monograph No. 3, 1962). First used in the standard "changes" and "changed conditions" articles, the term has been taken over for other clauses, such as the "suspension of work" and "government-furnished property" provisions. See J. Paul, United States Government Contracts and Subcontracts 430 (1964). The consistent practice appears to have been that an "equitable adjustment", as that phrase is used in these articles, can cover an allowance for a profit on work actually done, but does not encompass unearned but anticipated profits. *See* United States v. Callahan Walker Constr. Co., *supra*, 317 U.S. at 61, 63 S.Ct. 113; Bennett v. United States, 371 F.2d 859, 864, 178 Ct.Cl. 61, 69–70 (1967); *cf.* Bruce Constr. Corp. v. United States, 324 F.2d 516, 163 Ct.Cl. 97 (1963). This is far from an unnatural interpretation since, in these clauses, the "equitable adjustment" is usually tied by express words to an increase or decrease in the contractor's costs.

The plaintiff, which impliedly concedes that this has been the practice under the other clauses, maintains that a different reading for "equitably adjusted" is proper in the newer "default" article. The contention is that the "changes", "changed conditions", and similar clauses dealt with a different problem, and the interpretation which was appro-

priate in that context does not fit as well into the present situation. There are, we think, two related answers to that argument. One is that "equitable adjustment" has become a term of art (in federal contracts) with a commonly understood meaning in the aspect involved in this case (*compare* Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 545, 184 Ct.Cl. 18, 33 (1968)), and that accepted content should be followed unless there are very strong counterbalancing reasons. Such a counterweight might be a marked alteration in context, but if the change is not significant and drastic it should not be sufficient to alter the established meaning of this specialized term. Here, the change in context—even if one accepts plaintiff's point that the context does in fact differ—is moderate, rather than severe. A concept hitherto applied to an ongoing agreement is now to be applied to one which is at its end, without any future. That change in context does not seem any greater than the transfer of the concept of an "equitable adjustment" from the "changes" article to the clause controlling "government-furnished property" or allowing an award for "suspension of work".

■■ The more basic reason for rejecting plaintiff's argument is that, at bottom, the context is not at all different in kind. With regard to amounts, a termination is essentially the same as a change under the "changes" clause reducing the number of items to be furnished. In fact, a "change" of that kind can often be characterized as a partial termination, and vice versa. *Cf.* Williamsburg Drapery Co. v. United States, 369 F.2d 729, 177 Ct.Cl. 776 (1966); Nesbitt v. United States, 345 F.2d 583, 170 Ct.Cl. 666 (1965), cert. denied, 383 U.S. 926, 86 S. Ct. 931, 15 L.Ed.2d 846 (1966); National

Presto Indus., Inc. v. United States, 338 F.2d 99, 102, 167 Ct.Cl. 749, 753 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). Whether the decrease be total or partial, and whether it be called a change or a termination, the focus will still be on the amount of money with which the contractor should be left as a result of the transaction. In that calculation, reasonable costs and a reasonable profit on work actually done will normally be important, regardless of whether one proceeds by subtracting from the original fixed-price or by adding from zero. In other words, the problem of the "equitable adjustment" is entirely comparable whether the contractor is faced with a termination or with a change in quantity of work.[4] There is therefore no reason for discarding the historical meaning that term has acquired under the "changes" and like clauses.

■ It is possible that this particular plaintiff did not comprehend the impact of the meaningful words "equitably adjusted" in the "default" article of the contract, but nevertheless there was much to put it on notice. FPR Circular No. 25, *supra*, which spelled out the aim of the new clause, was available to government contractors and to the public. The Federal Procurement Regulations provided that, on termination of a fixed-price contract, "[a]nticipatory profits and consequential damages shall not be allowed" (41 C.F.R. § 1–8.303(a) (1968)), and said expressly that directives like the one just quoted could be used (in addition to computing the award on a convenience-termination) "for guidance in negotiating a settlement agreement, *or in making an equitable adjustment*" (41 C.F.R. § 1–8.000(b) (1968) (emphasis added)).[5] Moreover, the

---

4. We have characterized the award made under the convenience-termination article as an "equitable adjustment". Bailey Specialized Bldgs., Inc. v. United States, 404 F.2d 355, 363, 186 Ct.Cl. 71, 79 (Dec. 1968); Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 387–388, 187 Ct.Cl. —, — (Mar. 1969).

5. 41 C.F.R. § 1–8.201(b) (1968) warned that, in the absence of a convenience-termination clause, a termination of the contract normally constituted a breach of contract which could subject the Government to liability for common law damages, including anticipatory profits. This statement is obviously meant to apply to

meaning of "equitable adjustment" had become, so to speak, a "trade usage" for those engaged in contracting with the Federal Government. The knowledgeable federal contractor would understand it, and plaintiff, if it was not so knowledgeable, was charged with making itself aware of that usage. *Cf.* Uniform Commercial Code § 1–205. Since it was dealing with the Government, as to which a whole body of special contract provisions has developed, plaintiff could hardly take the naive stance that it had the right to read its contract as an unsophisticated layman might, without bothering to inquire into the established meaning and coverage of phrases and provisions which appear to be unusual or special to federal procurement. *Cf.* Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963). In this instance, slight inquiry would have brought forth the information that "equitably adjusted" was a term of art, and anticipatory profits would not be allowed.

■■ Although plaintiff urges us, in effect, to strain to read the contract as permitting the recovery of such unearned gain—on the ground that the policy of the law has been to avoid allowing the defendant to escape payment of such profits where it has acted improperly— the fact is that the development of federal procurement has been to the contrary. It has long been held that, on cancellation of a contract under the power of eminent domain, just compensation does not include anticipatory profits. Russell Motor Car Co. v. United States, 261 U.S. 514, 523–24, 43 S.Ct. 428, 67 L.Ed. 778 (1923). A major reason for the initiation and increasing use of convenience-termination articles has been to allow the Government to avoid paying unearned profits. G. L. Christian & Assoc. v. United States, 312 F.2d 418, 426–427,

160 Ct.Cl. 1, 15–16, rehearing denied, 320 F.2d 345, 160 Ct.Cl. 58, cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); Nolan Bros., Inc. v. United States, *supra* note 3, 405 F.2d, at 1256, 186 Ct.Cl. at 607. As for default terminations, the clauses first recognized a breach if the invocation of the article was shown to be wrong or the default excusable (see J. D. Hedin Constr. Co. v. United States, *supra*, 408 F.2d 424, 187 Ct.Cl. ——). They were then modified to reject such profits if the default for which the contractor was terminated turned out to be excusable, leaving untouched the situation where there was in fact no default (and the Government invoked the default article). After Klein v. United States, *supra*, 285 F.2d 778, 152 Ct.Cl. 8 (1961), granting unearned profits in such a case, the default articles were further amended, in general, to bar anticipated profits even in the instance in which it was found that there had been no default at all, and the contracting officer had acted erroneously. *See* Schlesinger v. United States, 390 F.2d 702, 710 n. 11, 182 Ct.Cl. 571, 585 n. 11 (1968). In 1967, GSA required convenience-termination clauses in contracts like the present one, so that from that time on the problem now before us is unlikely to arise. All in all, there appear today to be very few government contracts in which unearned gain can be granted if there is a termination (either for default or for convenience).[6] The trend has been steadily adverse to the allowance of that component of common-law damages, and the policy of federal procurement law is no longer what plaintiff insists. *See* Nolan Bros., Inc. v. United States, *supra*, and cases cited.

■ The result is that plaintiff cannot recover on its claim for anticipatory profits, the demand it makes here. But

---

(i) contracts which do not contain a provision for administrative determination comparable to that in the "default" clause under review (*cf.* J. D. Hedin Constr. Co. v. United States, *supra*, 408 F.2d at 432– 433, 187 Ct.Cl. at ——) and (ii) terminations (in the absence of a convenience-

termination clause) which do not purport to be for the contractor's default but merely for the Government's own convenience.

6. J. D. Hedin Construction Company v. United States, *supra*, involved a 1955 contract using an especially old form of "default" article.

it has not been paid the $6,491.77 which the contracting officer awarded to it as its "equitable adjustment" (and which it accepted on its claim for costs). Accordingly, it is entitled to recover that sum and judgment will be entered to that effect. To that extent plaintiff's motion for summary judgment is granted and the defendant's denied. With respect to the claim for anticipatory profits, plaintiff's motion is denied, the defendant's is granted, and the petition is dismissed.