**J.F. SHEA COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 599–84C.

United States Claims Court.

Aug. 26, 1986.

David P. Yaffe, Los Angeles, Cal., for plaintiff.

Richard W. Oehler, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant. G. Kevin Jones, Office of Solicitor, Dept. of Interior, of counsel.

## OPINION

BRUGGINK, Judge.

This matter comes before the court on the parties' cross-motions for partial summary judgment. Both motions seek summary judgment as to the same two issues. First, did defendant used the proper formula in computing the amount of equitable adjustment due for changed conditions encountered by plaintiff? Second, does the contract require use of rates published by Associated General Contractor of America (AGC rates) in lieu of plaintiff's actual cost records in computing equipment ownership expense?

Upon consideration of the parties' briefs and supporting materials, and after hearing oral argument, the court concludes that the plaintiff is entitled to partial summary judgment as to the first issue, and that defendant is entitled to partial summary judgment as to the second issue.

## I. FACTS

The following material facts are not in dispute:

Plaintiff, J.F. Shea Company, Inc., ("Shea") and defendant, United States, through the Bureau of Reclamation, Department of Interior, entered into a contract on August 29, 1975, for the construction of a project known as "Vat Tunnel, Strawberry Aqueduct, Bonneville Unit, Utah, Initial Division, Central Utah Project." In relevant detail, the contract consisted of the excavation and lining with concrete of a tunnel approximately 7.34 miles long. The original completion date for the project was scheduled for November 6, 1979.

The total contract price was $26,992,-662.00. This was based in part[1] on a unit price of $632.00 per linear foot of the 38,-760 foot long tunnel. After award of the contract, the parties agreed that solely for the purpose of progress payments, plaintiff would be paid for work performed at the following rates:

$462.10 per linear foot for *excavation* of the tunnel

$118.30 per linear foot for *concrete lining* of the tunnel[2]

The payment designated for excavating the tunnel had a greater profit margin for plaintiff than the payment designated for concreting it.

### Equitable Adjustment for Excavation

The specifications, in paragraph 4.1.2, provided that if water flows exceeded an average rate of 1,000 gallons per minute for 14 continuous days, the price for constructing the affected portion of the tunnel would be adjusted according to clause 3, the "changes" clause, in the General Provisions. On December 21, 1978, after excavating approximately 81% of the tunnel, plaintiff encountered water flows in excess of those anticipated by the contract specifications.

In order to combat this unanticipated flow of water, defendant unilaterally issued Order for Changes No. 2, Part 1 of which directed plaintiff to take the necessary steps to stem the flow of water to advance the excavation portion of the project. The order provided that, solely for the purpose of progress payments, payments for the remaining portion of the excavation would be made on the basis of actual direct costs, supported by certified cost statements, plus a reasonable allowance for indirect costs. Allowable indirect costs would include equipment ownership expense, supported by sufficient data. Final adjustment of these interim progress payments for the excavation portion of the project was to be made at a later time.

Between January 1979, and July 28, 1981, plaintiff excavated the remaining 7,322 feet of the tunnel. During this period, it submitted monthly certified cost statements to defendant on the basis of actual costs, including its equipment ownership expense.

The defendant duly made interim progress payments based on actual direct costs submitted, plus an allowance for indirect costs. Upon excavation of the tunnel, defendant issued Order for Changes No. 2, Part 2, which was its proposed final equitable adjustment in the contract price for excavation work performed after the change order. Defendant computed the adjustment based on actual costs incurred plus 8.7% which it unilaterally determined to be a reasonable profit.

### Equitable Adjustment for Concrete Lining

As the excavation of the tunnel neared completion, it became apparent that the concrete lining portion of the contract had been delayed due to the excess water, and that concrete lining work would also require more materials, increased labor and a revised time of completion. Rather than wait for a determination of actual costs, as it had done with the adjustment for excavation work, defendant decided to use forward pricing in calculating the equitable adjustment. In its initial proposed adjustment for the concrete lining, defendant directed plaintiff in Modification No. 5 to commence work on the concrete lining portion of the tunnel immediately upon "hole through" (the completion of the excavation portion of the contract), and determined that plaintiff was prospectively due an equitable increase of $5,537,051.00 in the contract price.

Plaintiff found Modification No. 5 unsatisfactory, and the parties entered into ne-

---

1. The balance of the total contract price originated in Schedule No. 3 involving unrelated work.

2. Shea was provided approximately $2 million at the commencement of work which was amortized over the entire length of the tunnel. Consequently, the total received per linear foot in progress payments was less than $632.00.

gotiations. During the course of these negotiations, defendant proposed that plaintiff be paid $118.30 per linear foot for the entire length of the tunnel, the amount originally allocated by the parties for progress payments for the concrete lining portion, plus the extra cost of performing the concrete lining work due to the changed conditions encountered. Plaintiff agreed to this method for pricing for the concrete lining portion and, thus Contract Modification No. 6, issued on October 21, 1981, amended Modification No. 5 and increased the earlier adjustment by $1,793,299.00.

The forward price method agreed on for the concrete lining portion of the contract therefore differed from the pricing method defendant had earlier adopted unilaterally to compensate plaintiff for the excavation portion of the contract. The excavation adjustment defendant adopted did not utilize the $462.10 per linear foot designated by the parties for excavation progress payments. As indicated earlier, defendant utilized actual costs incurred in completion of excavation of the tunnel plus a unilaterally determined profit of 8.7%.

Plaintiff has taken the position throughout that defendant's use of different methods to calculate the amount of equitable adjustment for the excavation and concrete lining portions of the contract deprives it of the higher level of profit it had bargained for in the excavation work.

By letters sent May 9, 1983, and May 10, 1983, plaintiff certified a claim to the contracting officer requesting an increase in the equitable adjustment for the excavation portion of the contract. On August 14, 1984, the contracting officer issued his final decision denying plaintiff's claim.

*Equipment Ownership Expense*

Parallel to plaintiff's claim for an increase in the amount of equitable adjustment is plaintiff's claim for an increase in the allowed amount of equipment ownership expense resulting from the changed conditions. As mentioned above, under Order for Changes No. 2, Part 1, plaintiff submitted monthly certified cost statements for progress payments for excavation. These statements included the indirect cost of plaintiff's equipment ownership expense pursuant to contract specification 1.3.9.

During the period from December 21, 1978, through November 30, 1979, plaintiff billed defendant for its equipment ownership expense on the basis of AGC rates despite the fact that on April 10, 1979, defendant had communicated that it would no longer compensate plaintiff based on those rates.

An interim audit conducted by defendant in May 1980, disallowed plaintiff's use of AGC rates in calculating equipment ownership expense, and concluded that plaintiff's actual costs had to be used. Moreover, the auditor, after examining plaintiff's cost records, disallowed depreciation attributed to the change order, reasoning that these costs had not been incurred in performing work under the change order, but rather were related to excavation work completed prior to the change order. Plaintiff submitted written comments to the auditor's report in August 1980, disputing the auditor's reasoning. From September through November of that year, the parties attempted to settle the amount of compensation to which plaintiff was entitled. Pursuant to these discussions, defendant paid plaintiff $1,700,466.00, consisting of plaintiff's actual recorded depreciation, plus a use allowance for plaintiff's owned equipment. The parties disagree on whether they entered into a final agreement regarding treatment of equipment ownership expense for this period.

During the period from December 1, 1979, until plaintiff's completion of the excavation portion of the project on July 28, 1981, defendant paid plaintiff based on actual recorded depreciation plus a use allowance of 1.25% per month.

In May of 1982, a second audit was conducted by defendant covering the entire period of December 21, 1978, through July 28, 1981. This second audit, which superseded the audit of May 1980, disallowed $1,828,809.00 of the invoiced equipment ownership expense that defendant had paid

to plaintiff. The audit, *inter alia*, disallowed depreciation through 1979 and the use allowance of 1.25%. Plaintiff disputed the findings of the second audit and claimed that it was an attempt, in part, to reopen disputes which had been compromised or settled.

In reaction to the second audit, plaintiff submitted a certified claim on May 9 and 10, 1983, increasing the amount of plaintiff's claimed equipment ownership expense from $3,075,495.00 to $5,723,342.00. The first figure was the amount plaintiff had been paid pursuant to the "agreement" to compromise and settle plaintiff's claim, based on plaintiff's actual cost records. The new figure was the amount calculated from AGC rates. On August 14, 1984, the contracting officer issued his final decision. Of the total amount claimed by plaintiff for equipment ownership expense (according to the AGC rates), the contracting officer allowed $2,535,406.00 (Contract Modification No. 13).

The equipment ownership expense computed by defendant differed from plaintiff's actual cost records primarily in two respects: (a) defendant used longer useful lives for the equipment than plaintiff; and (b) plaintiff used an accelerated method of depreciation by using the straightline method. Plaintiff asserts that under specification 1.3.9, equipment ownership expense for the work it performed under Order for Changes No. 2 must be calculated on the basis of AGC rates since defendant elected not to use plaintiff's actual cost records.

Defendant argues that its choices are not limited to either AGC rates or actual costs as recorded by plaintiff. Its position is that Modification 13 is proper in that contract specification 1.3.9 permits it to place plaintiff's actual cost records in compliance with the applicable regulations.

## II. DISCUSSION

A. *Did Defendant Use the Proper Formula in Computing the Amount of Equitable Adjustment for Excavation?*

■ The contract provides that if any change causes an increase in the contractor's cost, "an equitable adjustment" shall be made. At issue here is the proper formula to price the equitable adjustment for excavation work. Plaintiff claims that it is entitled to its "contract price" with respect to the entire excavation, namely $462.10 per linear foot, plus the incremental costs associated with the change order. Plaintiff argues that this is the same formula used in pricing the change order as to concrete lining and that this measure preserves the original bargain it struck.

Defendant counters that using $462.10 per linear foot as a point of departure gives plaintiff an unduly high profit with respect to change order work, arguing that plaintiff assumed no risk since it was guaranteed to recover its costs. Defendant would *delete* the $462.10 per linear foot figure as to excavation work done subject to the change order, and proposes to reimburse plaintiff for its actual costs plus a "reasonable profit."

For the reasons that follow, the court holds that in order to keep the plaintiff whole, it is entitled to compensation based on the original contract price.

1. *The contract was not severable.*

Determination of the precise formula to be applied in a change order depends on a number of variables. The most relevant one in the present case is whether the contract is for a lump sum or is divisible into separately priced units.

The underlying assumption in defendant's brief is that the contract was not for a lump sum: "It is, however, well-established that where, as here, the contract work involves severable items, it is appropriate to utilize the bid amount to reduce the contract price in the determination of an equitable adjustment." Defendant's Cross-Motion for Partial Summary Judgment at 6.

This argument is premised on an incorrect assumption. The court finds, based on uncontroverted facts, that the contract was

not severable, but was for a lump sum. The contract price was expressed in terms of a total construction cost including both excavation and concrete lining. In order to determine the proper formula, it is critical to maintain this distinction.

As the stipulated facts make plain, before any work began, the contract price for all work, including mobilization and ancillary work was $26,992,662.00. Given the number of change orders which have occurred, other than the one at issue, the contract price has dramatically increased. For example, Contract Modification Nos. 5 and 6 alone added a total of $7,330,350.00 to the price. Although the court has no way of determining what that price is now, those adjustments do not alter the fact that the contract was bid as, and remains, a lump sum contract.[3]

Defendant argues that the contracting officer's method of computing the equitable adjustment is "enhanced by Shea's bid in a per linear foot basis." Defendant then correctly points out that, in relevant measure, plaintiff agreed to perform the construction work for $632.00 per linear foot. What defendant ignores, however, is that the $632.00 figure is a consolidated bid for both excavation and concrete lining. *They were not separately bid.*

Defendant points to the division of the $632.00 into separate progress payments for excavation and concrete lining. Plaintiff admittedly adds to the error by referring to $462.10 as the "price" for excavation work, and $118.30 as the "price" for concrete lining. That terminology is, however, incorrect. The choice made by the parties to set progress payments for excavation at $462.10 per foot was solely for that purpose. It cannot have the effect of retroactively changing what started out as a lump sum bid into a severable contract.

Starting with the faulty premise that the contract is severable into excavation and concrete lining work, defendant exacerbates the error by asking the court to divide further the excavation work itself into two completely severable portions of the contract—one for excavation completed before the change order, the other for excavation done pursuant to the order.

The reason this error is significant becomes apparent upon examination of the cases cited by defendant. Defendant argues that the proper formula would deduct the contract price allotted to the "severable" portion and add the actual costs of the substituted portion plus a reasonable profit. The net effect would be to wipe out whatever profit plaintiff had originally anticipated with respect to the excavation part of its work, and substitute a lower profit margin. For support defendant cites *Gregory and Reilly Associates, Inc.*, FAA-CAP No. 65–30, 65–2 BCA ¶ 4918 (1965).

In *Gregory* the Federal Aviation Agency (as it was then named) awarded a contract to be performed in four phases, each phase containing a separately stated price in the contract. The government deleted one phase from the contract and sought to deduct the entire contract price for that phase. The contractor asserted that the proper adjustment should be a deduction of the reasonable cost of the work, without regard to the prices stated in the contract, thereby preserving its profit. The board, however, allowed a deduction based on the contract price since it was clear that the basis of the bidding was a firm fixed price for each phase of the work. *Id.* at 23,253. It held that where a clearly severable item is deleted in its entirety, the price reduction is to be measured by the contract price for that severable portion.

*Gregory* is inapposite. Here, the contract was not severable, but was bid on a

3. Since the plaintiff has presumably been paid the adjusted contract price for all ancillary and mobilization work, for concrete lining and for the bulk of the excavation, all that remains to be paid is the original contract price for the balance of the excavation work, plus the amount of the equitable adjustment and other minor items controverted in this lawsuit. Since the parties agreed in Modification Nos. 5 and 6 on a beginning point of $118.30 per linear foot for calculating the concrete lining change order, admittedly the "contract price" remaining will probably be the equivalent of $462.10 per linear foot.

lump sum basis. One type of work was merely substituted for another because of changed circumstances. Defendant ended up with exactly what it originally contracted for—a complete tunnel. There were no deletions.

Defendant additionally argues that the use of the $462.10 figure as a base for the equitable adjustment would grant an impermissible recovery of anticipated profits, citing *General Builders Supply Co. v. United States*, 187 Ct.Cl. 477, 409 F.2d 246 (1969). In *General Builders*, the Court of Claims refused to allow recovery of anticipated profits for a contract which was wrongfully terminated under the default clause. The court held that an equitable adjustment did not encompass anticipated but unearned profits. *Id.* 187 Ct.Cl. at 482, 409 F.2d at 249. The rule of *General Builders* is inapplicable. The holding of that court was limited to termination of a contract—the goods contracted for were never delivered. Moreover, as the court made clear, its holding was based on enforcement of a contract provision under which the government's erroneous default was treated as a termination for convenience:

> Although plaintiff urges us, in effect, to strain to read the contract as permitting the recovery of such unearned gain—on the ground that the policy of the law has been to avoid allowing the defendant to escape payment of such profits where it has acted improperly—the fact is that the development of federal procurement has been to the contrary. It has long been held that, on cancellation of a contract under the power of eminent domain, just compensation does not include anticipatory profits.... A major reason for the initiation and increasing use of convenience-termination articles has been to allow the Government to avoid paying unearned profits.

*Id.* at 485, 409 F.2d at 251.

A common thread found in *Gregory* and *General Builders* is that, in the government contracts context, courts have not awarded profit for work not performed, whether the non-performance results from termination or from deletion of a severable portion of work. This principle in no way advances defendant's position, however, since here there was neither a termination nor a deletion of a severable portion of a contract. As the board itself in *Gregory* pointed out:

> We would agree with the Contractor that, where there is a change order reducing work *under a lump sum contract*, an appropriate equitable adjustment is the cost of performing that deleted work. In such a case, since no firm fixed prices have been agreed upon for separate items of work, it would be appropriate to consider what it would have cost the Contractor to accomplish the deleted work in arriving at an equitable adjustment for a deductive change. However, that is not the case here.

65–2 BCA at 23,253 (emphasis added).

Finally, defendant cites *United States v. Callahan Walker Construction Co.*, 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49 (1942), to support its method of calculating the adjustment. The Supreme Court stated there that an equitable adjustment "involved merely the ascertainment of the cost of digging, moving, and placing earth, and the addition to that cost of reasonable and customary allowance for profits." *Id.* 317 U.S. at 61, 63 S.Ct. at 115.

Whereas *Callahan* does give validity to the grant of a "reasonable" profit for the margin of extra work performed, it does not lend support to defendant's position for two reasons. First, *Callahan* involved a contractor's failure to follow a procedural remedy pursuant to the disputes clause contained in the contract. The contracting officer had made a determination of the amount of an equitable adjustment, which the contractor failed to timely appeal. The holding of *Callahan* is that since the contracting officer's final decision had not been timely appealed under the disputes clause, it could not be overturned. The court's statement about calculation of an equitable adjustment was therefore not made in the context of the issue present

here. More importantly, the equitable adjustment in *Callahan* was for work performed beyond that specified in the contract. Consequently, there was no bargained-for original contract price for the additional work. Here, the contractor was ordered to substitute one type of work for another where the parties had originally agreed on a price for the work undertaken.

### 2. *Determination of the Proper Formula.*

■ Having found that this is a lump sum contract, the court must now determine what is the proper method for pricing an equitable adjustment involving substitution of work. The Court of Claims described equitable adjustments as "corrective measures utilized to keep a contractor whole when the Government modifies a contract." *Bruce Construction Corp. v. United States*, 163 Ct.Cl. 97, 100, 324 F.2d 516, 518 (1963). Moreover, since the goal of the equitable adjustment is to place the contractor in the position he would have been in had the change not been encountered, as a general rule, the equitable adjustment should not alter the contractor' profit or loss position from what it was before the change occurred. Thus, the Court of Claims stated in *Pacific Architects and Engineers, Inc. v. United States:*

It is well established that the equitable adjustment may not properly be used as an occasion for reducing or increasing the contractor's profit or loss, or for converting a loss to a profit or vice versa, for reasons unrelated to a change.

203 Ct.Cl. 499, 508, 491 F.2d 734, 739 (1974).

The reason for this approach was stated in *Bruce:*

Since the purpose underlying such adjustments is to safeguard the contractor against increased costs engendered by the modification, it appears patent that the measure of damages cannot be the value received by the Government, but must be more closely related to and contingent upon the altered position in which

the contractor finds himself by reason of the modification.

163 Ct.Cl. at 100, 324 F.2d at 518. *See also Nager Electric Co. v. United States*, 194 Ct.Cl. 835, 851–53, 442 F.2d 936, 945–46 (1971); *Keco Industries, Inc. v. United States*, 176 Ct.Cl. 983, 1000–02, 364 F.2d 838, 849–50 (1966).

In *S.N. Nielsen Co. v. United States*, 141 Ct.Cl. 793 (1958), the plaintiff made a claim similar to the one propounded by the defendant here. There, the plaintiff's original bid had been substantially too low. Subsequently, a change order substituted a cheaper alternative for parts of the work. Plaintiff sought to use the change order to correct its original mistake. The court rejected that approach:

The plaintiff points to its losses under the outside utilities electrical portion of its contract. However, its losses would have been the same if the change order had not been issued, since it finds no fault with the contracting officer's figures as to the costs as they would have been without the change order and the costs as they were under the change order.

*Id.* at 796–97.

Similarly, in *Keco*, the court preserved the contractor's loss position and articulated the formula to be used when there is a substitution:

In the instant case, if there had been no change order plaintiff would have lost $148.80 per unit in manufacturing the gasoline driven units.... the same unit loss which plaintiff would have had if there had been no change order. In other words, in the formula which defendant advocates under its counterclaim, the change would not, in the *Nielsen* language, increase plaintiff's losses....

It is accordingly concluded that the adjusted unit contract price of the 100 changed units should be $1,454.78 which represents *the contract price* of the gasoline driven units ($1,720) *less* $265.22 which is *the difference between the production cost of the two type units....*

176 Ct.Cl. at 1002, 364 F.2d at 850 (emphasis added).

This same formula—subtraction from the contract price of the cost of the work or materials as originally specified and addition of the cost of new work—has been applied in other cases involving substitution change orders. *See, e.g., Massman Construction Co.,* Eng. BCA No. 3660, 81–1 BCA ¶ 15,049; *Itek Corp. Applied Technology Division,* ASBCA Nos. 13528, 13848, 71–1 BCA ¶ 8906; *Reliance Enterprises,* ASBCA No. 13404, 69–2 BCA ¶ 7783. *See generally* J. Cibinic & R. Nash, Administration of Government Contracts 457 (2d ed. 1985).

Use of this formula means that the parties' original bargain is maintained. Just as the cases make plain that a contractor in a loss position should not improve his circumstances through a change order, a contractor who is in a profit position should not lose that profit just because a different method of work is substituted.

Defendant's argument that it in effect applied this same methodology when it reimbursed plaintiff "for its actual costs incurred' in excavating the last 7,322 linear feet of the tunnel, plus a unilaterally determined profit of 8.7 percent" is incorrect. It is fundamentally flawed because it begins by *deleting the original contract price* rather than using it as the starting point in computing the adjustment. With the exception of the cases which have been distinguished herein, defendant provides no support for that approach.

Allowing plaintiff its originally bargained-for profit is not a windfall, as suggested by defendant. It maintains symmetry with cases such as *Bruce, Nielsen* and *Keco* in which plaintiff's loss position is left unaltered by change orders. The defendant's argument that there is no risk assumed with respect to change order work is true only up to a point. Plaintiff assumed a risk in its original bid on the contract as a whole *up to the amount of its anticipated costs.* It should not be penalized by eliminating the fruits of that earlier risk-taking because of a change order.[4] However, to the extent that the costs are in excess of those originally anticipated, defendant is correct that there is no risk. Plaintiff did not, in a subsequently priced change order, put any additional capital at jeopardy. It was guaranteed a recovery of those additional costs.

Consequently, the proper formula shall be as follows:

(1) Begin with the adjusted contract price.

(2) Delete the projected cost of excavating the last 7,322 linear feet of tunnel had plaintiff not encountered the changed conditions;

(3) Add the actual cost of excavating under the changed conditions;

(4) Add a reasonable profit and overhead computed in accordance with governing regulations,[5] on the difference between items (2) and (3).

B. *May Defendant Modify Plaintiff's Posted Equipment Expenses in Accordance With Applicable Regulations?*

Contract Specification 1.3.9 provides:

**4.** The court rejects plaintiff's argument that the use of "inconsistent" methods in computing the equitable adjustment for two aspects of the same change is *per se* inequitable. *See* Plaintiff's Motion for Summary Judgment at 25. The method used by defendant to price the concrete lining portion change order is different from, rather than "inconsistent" with, defendant's method of pricing the excavation change order. The parties forward priced the concrete lining portion change. When the proper formula is utilized, however, the "contract price" sweeps in all such bilateral price adjustments due to previous change orders. In pricing Change Order No. 2, under the formula adopted here, the adjusted contract price used as a starting point

takes into account both the original bargain with respect to excavation, and subsequent agreements as to the concrete lining change order.

**5.** The plaintiff cites Federal Acquisition Regulations, Sections 15.900 to 15.905–2. Defendant cites Bureau of Reclamation Procurement Regulations System, Section 14 S–3.808–71 as being applicable. If the parties cannot reach agreement on the proper percentage profit on the incremental difference between the original anticipated costs and actual costs, that issue would remain for the court's resolution.

a. General.—Adjustments allowed under Clause No. 3 or Clause No. 4 of the General Provisions of this contract may include allowances for ownership of equipment owned by the contractor or any subcontractor and available at the site of the work. It will be normally anticipated that allowances for equipment ownership will be made in accordance with the tables in the "Contractors' Equipment Manual" in effect on the date of the contract, as published by the Associated General Contractors of America, except as herein modified. However, for contract modifications over $100,000, the contracting officer may, at his option, compute allowances for equipment ownership expense based on actual cost records complying with 41 C.F.R. Parts 1–3.8 and 1–15.

The contract modification for excavation was for over $100,000.00. Consequently, although this provision clearly assumes that under normal circumstances AGC rates will be utilized, it also gives the contracting officer the option to "compute" plaintiff's equipment ownership expense "based on actual cost records complying with 41 C.F.R. Parts 1–3.8 and 1–15."

■ In this case, the contracting officer rejected the AGC rates and chose to use plaintiff's booked expenses.[6] The issue to resolve is whether, in making this choice, the contracting officer had the right to *place* plaintiff's figures into compliance with the applicable regulations, or did he have to accept them as they appeared on plaintiff's books?

Phrased slightly differently, the question becomes, do plaintiff's booked expenses have to be in compliance with depreciation regulations before or after the exercise of the contracting officer's election? If they must already be in compliance, then the contracting officer's election becomes significantly more circumscribed. As defendant suggests, plaintiff is arguing that the

option is, AGC rates, or expenses as booked by plaintiff.

It is worthwhile at the outset to distinguish three potential issues, which, at least for the purposes of these cross-motions, need not be resolved. First, there is no challenge here to the contracting officer's exercise of his option to use plaintiff's booked expenses. Given the apparent unfettered discretion in the contracting officer to reject AGC rates, such a challenge would, in any event, be difficult to sustain. Moreover, at this stage of the case, there is no issue as to whether plaintiff's booked expenses in fact complied with applicable regulations. By urging use of AGC rates the plaintiff has not waived the right to challenge the propriety of the contracting officer's application of the regulations. For the sake of this discussion, the court will assume that the changes made in the plaintiff's booked equipment expenses were required by the regulations.

Finally, it is not necessary, for the moment, to determine whether the parties entered into an agreement with respect to treatment of equipment expense. From the pleadings and argument, it appears that even if such an agreement controlled, it would not affect all of the years in question. Consequently, the legal effect of specification 1.3.9 must still be determined.

Neither party has presented any cases construing the language at issue here. The court has also been unable to find any precedent squarely on point. Nor does there appear to be any secondary source material discussing the application of specification 1.3.9, or its evolution.

Plaintiff tenders two primary arguments for its construction of the contract. First, plaintiff argues that AGC rates have become "widely accepted," and have a "long established history." It recognizes that a contractor's actual cost records are the best evidence of equipment ownership

---

**6.** Plaintiff filed a notice of evidentiary objections to the affidavit of Michael K. Barrett, a certified public accountant and Contract Price Analyst whose views regarding the plaintiff's equipment ownership expenses were adopted by the contracting officer. Plaintiff's Motion To Strike portions of the affidavit is granted and those specific portions objected to have not been considered for the purposes of the cross-motions for partial summary judgment.

costs, but asserts that circumstances may warrant use of AGC rates as a reasonable approximation of those costs.

The issue, however, is not whether AGC rates are favored. The strongest evidence of that, in any event, is the contract itself, in which specification 1.3.9 suggests they will normally be used. That same provision goes on, though, to give the contracting officer discretion not to use those rates, but to compute allowances based on plaintiff's cost records. Any presumption which might otherwise attach to the use of AGC rates, therefore, is not supportable when the provision is read as a whole.

Plaintiff's second argument turns on a change made in specification 1.3.9. The version applicable here has been quoted above. It was implemented, however, immediately prior to the award. The superseded version of 1.3.9 provided that:

> It will be normally anticipated that allowances for equipment ownership will be made in accordance with [AGC rates], except as herein modified. However, *the contracting officer may compute allowances for equipment ownership expense different than that provided by the use of the AGC schedule as modified herein if sufficient evidence of the amount thereof complying with 41 C.F.R. Parts 1.3.8 and 1–15 satisfactory to the contracting officer is available.*

(Emphasis added.)

Plaintiff argues that this language "specifically gave the contracting officer the authority to devise his own method for computing a contractor's equipment ownership expense." Plaintiff's Motion for Partial Summary Judgment at 40. Plaintiff goes on to point out that it was this superseded version which defendant referred to in a cost analysis prepared in connection with Order for Changes No. 2. Defendant's Answer, Exhibit A, at 14. Plaintiff is correct. In responding to a challenge by plaintiff to the contracting officer's adjustment of the plaintiff's cost figures, the analysis specifically relies on the portion of 1.3.9 which was superseded. That misplaced reliance, however, is immaterial if

the applicable version of 1.3.9 is held to have the same effect.

Plaintiff argues that the change in specification 1.3.9 of necessity must have been for some purpose, and that the substitution can only have been intended as a limitation on the contracting officer's options. Defendant responds that the new version is even more favorable to the government's position, and that it is unreasonable to assume that a unilateral change of this nature would be prompted by a desire to put limitations on the contracting officer.

The court concludes that in the absence of any contemporaneous explanations of the change, and in view of the unlikelihood that the defendant would spontaneously limit its options in the way urged by plaintiff, the earlier version is not helpful in determining the meaning of specification 1.3.9.

The critical expressions to be construed —"compute" and "based on"—are not terms of art. And an examination of their commonplace understanding is not favorable to the plaintiff.

The Oxford English Dictionary gives the following primary definition of "compute": "To estimate, ... to calculate, reckon, count." It defines it in a wider sense as: "To estimate, 'reckon,' take account of, take into consideration." II Oxford English Dictionary 749 (1893). It defines the relevant use of the term "base" as follows: "To make, lay, form a foundation for.... To place upon a foundation or logical basis." I Oxford English Dictionary 688 (1888). Webster defines "base" in relevant measure as, "to found; to establish as an argument or conclusion." Webster's New International Dictionary 225 (1939).

At a minimum, these terms plainly permit the notion of modification. They do not describe a process of wholesale incorporation and clearly do not require it. Computation implies a mental process. Although it could, in the abstract, be limited to a simple mathematical calculation, here it is used in conjunction with the expression "based on ... records complying with 41 C.F.R." There is nothing in the construc-

tion of the paragraph or its specific terminology which compels the conclusion that the records have to be in compliance *before* the computation.

To paraphrase using the dictionary definitions, the contracting officer may "take account of or calculate allowances for equipment ownership expenses established on the foundation of actual cost records."

The construction plaintiff argues would yield the result that all financial records would have to be in 100% compliance with applicable regulations, or else AGC rates would automatically control. What if the records for a multi-million dollar project were only slightly out of compliance? Would the contracting officer be prevented from making a minor adjustment? To answer yes would ignore the reality that a contractor's books and records are primarily a collection point for financial information which is put to multiple uses. They are used for the company's own financial statements; they are used for tax purposes; and they are used for obtaining reimbursement under cost-plus contract modifications, such as the change order here. It is unrealistic to assume that the drafters of specification 1.3.9 anticipated that there was any significant likelihood that a company's books and records would be maintained in accordance with the anticipated construction put on government regulations, particularly when those regulations are not susceptible in the abstract of mathematical precision.

The court concludes that the least strained reading of specification 1.3.9 is that, when confronted with the contractor's books and records, the contracting officer may take that raw financial information and manipulate it in such a way that it satisfies regulatory requirements. Consequently, defendant had the right, subject to any agreement to the contrary, to place plaintiff's books and records in compliance with applicable regulations.

## III. CONCLUSION

For the reasons stated, the court concludes that each party is entitled to partial summary judgment. Accordingly,

IT IS ORDERED:

1. Plaintiff's motion for partial summary judgment is granted to the extent that defendant shall reimburse it for Order for Change No. 2 on the basis of the formula set out in this opinion.

2. Defendant's Motion for Summary Judgment is granted to the extent that plaintiff's records for equipment ownership expense may be put into compliance with applicable regulations in computing the equitable adjustment due plaintiff.

3. The parties will file a joint preliminary status report with respect to the remaining issues by October 15, 1986.