GUY F. ATKINSON COMPANY OF
CALIFORNIA AND
SUBSIDIARIES, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE SERVICE,
Respondent-Appellee.

No. 85–7715.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1986.

Decided April 15, 1987.

As Amended June 25, 1987.

C. Douglas Floyd, San Francisco, Cal., for petitioners-appellants.

William A. Whitledge, Washington, D.C., for respondent-appellee.

Before KENNEDY, TANG and THOMPSON, Circuit Judges.

TANG, Circuit Judge:

Guy F. Atkinson Co. ["Atkinson"] appeals from a determination by the United States Tax Court of a $4,115,981 tax deficiency. We have jurisdiction under 26 U.S.C. § 7482. We affirm.

*FACTS AND PROCEEDINGS:*

Atkinson's subsidiary, Walsh Construction Co., was managing partner in a joint

venture, Water Tunnel Contractors ["WTC"] [1]. WTC was organized to construct a water tunnel for New York City. WTC submitted winning bids approximating $222 million for the contracts related to the water tunnel project. In its 1970 federal partnership income tax return, WTC elected to report income and expenses arising from the project under the completed contract method of accounting as set forth in the Treasury Regulations. Under this method of accounting, all income and expenses derived from a long-term contract are reported only in the year in which the contract is completed, permitting reporting of income and expenses on a transactional rather than an annual basis. "Completion" of a long-term contract occurs upon final completion and acceptance. Where disagreement arises as to completion, "dispute" provisions provide for reporting of gain or loss on or after the taxpayer "tenders" the subject matter of the long-term contract. *See* Treas.Reg. § 1.451(d)(2), (3), (4).

WTC began work in February 1970 and immediately experienced significant delays and expenses in excess of payments provided for in the contract. The parties executed modifications to the contract in November 1973 and July 1974. Pursuant to these modifications, WTC conveyed title to and liens on its plant, facilities and equipment which were located at the project sites to the city as security for performance. Because of a dispute in December 1974, WTC suspended all operations except pumping and guard services. It resumed work under an interim agreement in 1975 for four months. With less than 60% of the tunnel finished, WTC ceased all work on July 7, 1975 and on July 9, 1975 was declared in default by the city. On July 14, 1975, WTC surrendered possession of all its property on the sites.

On July 28, 1975, WTC filed for injunctive relief in U.S. District Court. In opposing the motion, the city stated that its contractual relationship with WTC was at an end and that WTC would not be doing further work on the tunnel project. Settlement attempts in the fall of 1975 bore no fruit, and WTC apparently decided against returning to work following the city's rejection of a settlement offer in November 1975. The city, without objection from WTC, re-let a portion of the contract to another joint venture. In an amended complaint filed in September 1975, WTC sought, inter alia, quantum meruit recovery for all work performed and money expended or, in the alternative, damages for breach of contract amounting to $205 million. The city's counterclaim, filed in June 1977, alleged breach of contract and sought damages amounting to $369 million.[2]

On its partnership returns for the years 1974 and 1975, WTC claimed deductions for losses it had incurred on the project. The Commissioner disallowed the claimed deductions ruling that the contract had not been "completed" in either of those years. Even assuming 1975 was a proper year for deducting losses, the Commissioner determined that certain items deducted as "project shutdown costs" were not deductible.[3] Upon appeal, the Tax Court found in favor of the Commissioner, holding that the termination of contract work after less than 60% of the work was performed was not "final completion and acceptance" so as to permit reporting of income and losses in either 1974 or 1975. The Court reasoned that WTC had neither performed its obligations nor modified them by 1975. The Court reasoned further that the dispute provisions did not apply with respect to contracts which have not been "substantially completed." The Court concluded that where the dispute provisions do not apply, reporting of gain or loss must be deferred until such time as the taxpayer can determine whether the contract will result in a

---

1. Atkinson filed consolidated income tax returns with its subsidiaries during the calendar years 1972 through 1975. WTC filed federal partnership income tax returns for the years 1970 through 1975.

2. The parties ultimately settled in 1979. By the terms of the agreement, the city paid $23.5 million to WTC and rescinded its declaration of default, and the parties released all claims against each other.

3. These items included certain inventories seized by the city, materials purchased but not yet installed, and future receivables under the contract.

net gain or net loss. Finally, the Tax Court found for the Commissioner on the non-deductibility of the project shutdown costs.

*DISCUSSION:*

■ The issues in this case present mixed questions of law and fact subject to review de novo by this Court. *See United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We note, however, that the Commissioner has latitude in the interpretation of the Internal Revenue Code, and that the Tax Court's opinions bearing on the Internal Revenue Code are entitled to deference because of its special expertise in the field. *Take v. Comm'r,* 804 F.2d 553, 556 (9th Cir.1986).

1. *Atkinson's Work Stoppage and the City's Taking of Possession Did Not Amount to Final Completion and Acceptance for the Purposes of § 1.451–3(d)(1)*

■ Treasury Regulation section 1.451–3(d)(1) states that, for taxpayers who elect the completed contract method, income and expenses arising from a long-term contract must be reported in the taxable year in which the contract is "completed."[4] A long-term contract is considered "completed" upon "final completion and acceptance." Treas.Reg. § 1.451–3(b)(2). Judicial interpretation of these terms in the context of the regulations at issue is scarce. Existing cases provide little guidance, as they

assume performance of all the work specified in the contract, or something close. *See A.S. Wikstrom, Inc. v. Commissioner,* 28 T.C.M. 143, 152 (1969); *National Contracting Co. v. Commissioner,* 37 B.T.A. 689, 701 (1983), *aff'd,* 105 F.2d 488 (8th Cir.1939). Contrary to Atkinson's suggestion, these cases are not persuasive authority in the circumstances of this case, where performance is far less extensive. Accordingly, we turn to related regulations and general principles of contract law for guidance in interpreting the phrase "final completion and acceptance".[5] The regulations do not apply to the tax year in question, and are therefore not binding; they do, however, shed light on the meaning of "final completion and acceptance," making them a useful tool in our analysis.

■ The clear import of the regulations is fatal to Atkinson's claim that its abandonment of the project, and the city's taking of possession of the sites and property, amounts to "final completion and acceptance."

The parties here hardly behaved in a way as to indicate completion and acceptance. WTC bolted its half-finished handiwork; the city declared default, and later sued for breach of contract. Atkinson did not manifest to the city any belief that it had discharged its obligation by performance. Nor did the city indicate assent to accept-

---

4. Treas.Reg. § 1.451–3(d)(1) states in pertinent part:

**Completed contract method—(1) In general.** Except as otherwise provided in paragraphs (d)(2), (3) or (4) (relating to disputes) of this section, under the completed contract method, gross income derived from long-term contracts must be reported by including the gross contract price of each contract in gross income for the taxable year in which such contract is completed (as defined in paragraph (b)(2) of this section). All costs properly allocable to a long-term contract (determined pursuant to paragraph (d)(5) or (6) of this section) must be deducted from gross income for the taxable year in which the contract is completed. In addition, account must be taken of any material and supplies charged to the contract but remaining on hand at the time of completion.

5. Treas.Reg. § 1.451–3(b)(2)(B) states that facts and circumstances to be considered in determining whether final completion and acceptance have occurred include:

... [t]he manner in which the parties to the contract dealt with each other and with the subject matter of the contract, the physical condition and state of readiness of the subject matter of the contract, and the nature of any work or costs remaining to be performed or incurred on the contract. In considering the manner in which the parties deal with the subject matter of the contract, any use of the primary subject matter of the contract by the purchaser (except for testing purposes that produce no gross revenue, cost savings, or other substantial benefits for the purchaser) will be considered.

ance of WTC's abortive efforts as performance entitling it to payment.

The city re-let portions of the contract to other contractors, without objections from Atkinson, in order that more than 40% of the water tunnel project could be completed. Clearly, more than a few last nails remained to be driven.

Familiar contract principles also refute Atkinson's claim that "final completion and acceptance" occurred. The city's only use of the incomplete tunnel related to the re-letting of the unfinished work to other contractors.

Reference to general contract principles reinforces our analysis under § 1.451–3(b)(2)(i)(B). Completion and acceptance contemplate discharge by performance of the contractual obligation, and consequent severance of the relationship between the parties. *See* 5A A. Corbin, Corbin on Contracts § 1245 at 578–580 (1964). One learned commentator has aptly described the effect of defective performance for the purpose of analyzing whether such performance may result in discharge:

> The mere receipt of [a] defective performance is not in itself sufficient to discharge [a] claim to damages 'for the breach. There must be an expression of assent to accept it in satisfaction and as a complete discharge.... [T]he [obligee] must be aware of the performance that is being tendered or that has been rendered and he must express his assent to accept it as a complete discharge of the obligor's duty to him.

*Id.*

As discussed above, nothing in the facts of this case indicates assent by the city to accept the abortive performance of WTC as a "complete discharge" of WTC's duty. On the contrary, the city took possession of the product of WTC's defective performance, declared default, and sued for breach of contract.

We decline to lend to the Treasury Regulations an interpretation which would permit unilateral work stoppage and the taking of possession by the buyer to circumvent the completed contract method.[6] Under the regulations, as well as under principles of contract law, there is no indication the sequence of events in issue amounted to "final completion and acceptance." In the past, this Court has strictly construed the term "completed" as used in the regulations and has squarely rejected the notion that "substantial completion" satisfies the regulations' completion requirement. *E.E. Black, Ltd. v. Alsup*, 211 F.2d 879, 880 (9th Cir.1954) (construction of building without installation of thermostats did not amount to "completion" within meaning of regulation). We reiterate that construction today. Absent completion, only upon final resolution of the parties' claims by agreement or by authoritative decree can there occur termination of the contractual relationship as contemplated by the regulations. Accordingly, we proceed to evaluate whether the "dispute provisions" make inapplicable the requirement of final completion and acceptance as set forth in § 1.451–3(b)(2).

2. *The "Dispute Provisions" of the Treasury Regulations Are Inapplicable, thus Prohibiting Atkinson from Deducting Claimed Losses in 1975*

Atkinson contends that WTC "tendered" the water tunnel, and thus that the "dispute provisions"[7] of the Treasury Regula-

---

**6.** The Tax Court found that termination of the contract was "unilateral," and that finding is plainly supported by the evidence. Atkinson's claim that the Tax Court did not so find borders on the frivolous, given its earlier claim that "in the court's view, WTC's termination was 'unilateral.'"

**7.** The "dispute" provisions provide an exception to the completed contract method. Subpara-

graph (2), which governs disputes over buyer claims, provides for the reporting of income and deductions in the year in which the dispute is resolved.

Subparagraph (3) governs disputes over taxpayer claims and provides for reporting of income in the year in which the dispute is resolved. Deductions occurring subsequently to completion are deducted in the years in which incurred.

tions permit reporting of loss in 1975, the year in which Atkinson was declared in default and surrendered the premises and property. Atkinson emphasizes the city's demand and WTC's compliance therewith to surrender the tunnel, and the city's stated position in 1975 that WTC would not be doing further work on the project. We disagree.

■ Resolution of this issue focuses on the definition of "tender." The regulations are silent. Accordingly, we turn to general principles of contract law. *Cf. Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952); 2A N. Singer, *Statutes and Statutory Construction* § 50.01 at 421–22 (4th ed. 1984). Professor Williston has defined tender as an offer to perform an obligation, coupled with the present ability to so perform, so that absent the refusal to cooperate by the party to whom the tender is made, the obligation would be immediately satisfied. 15 S. Williston, Williston on Contracts § 1808 at 418 (1972). Courts and commentators have applied the term "tender" to both the obligation to pay money and the transfer of property. The essential requisites of tender are:

(1) An unconditional offer to perform, coupled with a manifested ability to carry out the offer;

(2) A production of the subject matter of the contract;

(3) The property tendered must not be less than what is due; and

(4) If greater, there must be no demand for a return of the excess.

*Id.* § 1810 at 421–22.

[5] Tender gives a right to performance from the other party, or to an action for damages against that party. Thus, tender may operate to discharge the contractual obligation. *Id.* § 1809 at 419–20. *See*

Subparagraph (4), which we consider most applicable to this case, governs contracts with disputes over claims from both buyer and taxpayer. It provides as follows:

(4) **Contracts with disputes from both buyer and taxpayer claims.** (i) This subparagraph applies in any case where, on or after a taxpayer tenders the subject matter of a long-term contract, a dispute exists involving both

*Monroe Street Properties, Inc. v. Carpenter,* 407 F.2d 379, 380 (9th Cir.1969).

■ WTC's abandonment of the work sites was anything but a "tender" of the subject matter of the contract. WTC lacked the ability to perform, in the sense that its financial distress disabled it from any activity after 1975 except the conduct of litigation. Nor did the property which was abandoned by WTC and seized by the city—a half-finished water tunnel—approximate what was due under the contract. Were we to accept such a proposition, it would follow that WTC's "tender" of a half-finished water tunnel gave it the right to full payment, or an action for damages for the full contract price, against the city. That would be an absurd result.

Our conclusion is guided by contract principles but finds further support in the examples set forth in illustration of the dispute provisions. The examples assume, with one exception, that the taxpayer has "finishe[d] construction." The disputed items in the examples include the wrong sort of paint on bridge girders, ex. 2 to § 1.451–3(d)(2), a defective elevator in a manufacturing plant, ex. 3 to § 1.451–3(d)(2), defects in heating and electrical systems in a building, ex. 2 to § 1.451–3(d)(3), and location and workmanship of heating ducts, ex. 1 to § 1.451–3(d)(4). In only one example does Atkinson find potential support for the proposition that a dispute of the magnitude of its half-finished water tunnel is a proper case for application of the dispute provisions. That example, ex. 2 to § 1.451–3(d)(4), involves a builder, R, who "tender[s]" an office building to X. X finds "certain aspects" of the construction so unsatisfactory that he demands an additional $4 million worth of work on the $10 million contract. Atkinson contends that

claims by the taxpayer for an increase in the contract price and claims by the other party to the contract either for a reduction in the contract price or for the performance of additional work under the contract. In any case described in the preceding sentence, principles similar to the principles of subparagraphs (2) and (3) of this paragraph shall be applied.

the example implicitly hypothesizes an office building only 60% complete, and reasons that its predicament is so analogous as to trigger the dispute provisions. We disagree. The example does not embody an arithmetic formula which purports to calculate whether tender has occurred based upon the amount of money in dispute. Instead, the example contemplates an obligor who insists that it has fully performed and who delivers his product for acceptance. Such a scenario hardly encompasses the abandonment of a slightly more than half-finished tunnel and subsequent seizure of the subject matter of the contract. We do not read the language of the Treasury Regulations, construed in light of contract law principles, to dictate such a result.

### 3. The "Project Shutdown Costs" Were Not Properly Deductible in 1975

 Atkinson contends that Treas.Reg. § 1.451–3(d)(1)[8] permits deduction of its "project shutdown costs" as costs properly allocable to the contract. Affirmance of the Tax Court on the completion issue renders unnecessary an extended discussion of the merits of this issue. The contract was simply not completed, as required by § 1.451–3(d)(1), in 1975. The materials at issue were not installed in 1975, but "remain[ed] on hand." Inventories and future receivables should not be included in the cost of the contract; they were "leftovers." The regulations adopt the quite sensible approach of awaiting final resolution of the dispute, when a gain or loss on the items claimed will finally emerge. *See* Treas. Reg. § 1.451–3(d)(2)(i) (deductions taken in year in which dispute is finally resolved).

### CONCLUSION:

The Tax Court correctly concluded that, in viewing all the facts and circumstances, Atkinson's work stoppage and the city's taking of possession did not amount to

final completion and acceptance for the purposes of Treas.Reg. § 1.451–3(d)(1). The Tax Court was also correct in its conclusion that Atkinson's abandonment of the work sites with less than 60% of the job completed failed to satisfy the requirement of "tender," thereby precluding applicability of the disputes provisions of the Treasury Regulations. Our holding on the issue of completion requires affirmance of the Tax Court as to deductibility of the project shutdown costs.

**AFFIRMED.**

---

**8.** § 1.451–3(d)(1) reads in pertinent part:
   All costs which are propery allocable to a long-term contract ... must be deducted from gross income for the taxable year in which the contract is completed. In addition, account must be taken of any material and supplies charged to the contract but remaining on hand at the time of completion.