**GENERAL DYNAMICS CORPORATION and Affiliated Corporations, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 01–664 T.

United States Court of Federal Claims.

Dec. 30, 2005.

Gregory S. Gallopoulos, Jenner & Block LLP, Chicago, Illinois, for plaintiffs. Arnold S. Harrison and Michael A. Doornweerd, of counsel.

George L. Squires, U.S. Department of Justice, Tax Division, Court of Federal Claims Section, Washington, D.C., for defendant, with whom were Eileen J. O'Connor, Assistant Attorney General, and Mildred L. Seidman, Chief, Court of Federal Claims Section.

## OPINION

MEROW, Senior Judge.

Plaintiffs, General Dynamics Corporation and Affiliated Corporations (hereinafter

"General Dynamics") filed consolidated federal income tax returns for calendar years 1991, 1992, and 1993. After completing the necessary prerequisites by submitting claims to the Internal Revenue Service (hereinafter "IRS"), plaintiffs initiated the instant litigation by filing a four count Complaint. Count I of the Complaint seeks tax refunds of $57,355,541 for 1991, $11,721,580 for 1992, and $7,075,699 for 1993. At issue in the Count I refund claims is the correct time period for reporting gain or loss from plaintiffs' long-term contract with the Department of the Navy to develop and build the "A–12", a carrier-based low observable ("Stealth") attack aircraft. The Navy's Contracting Officer terminated this 1988 long-term A–12 Contract on January 7, 1991 for plaintiffs' asserted default. The validity of the default action remains in separate (Docket No. 91–1204 C) active litigation in this court. *See McDonnell Douglas Corp. v. United States,* 323 F.3d 1006 (Fed.Cir.2003). Here, the parties have each moved for partial summary judgment with respect to Count I of the Complaint, seeking a determination as to whether plaintiffs' proposed amended reporting of gain or loss on the basis that the A–12 Long–Term Contract was completed in 1991 is sanctioned by the Internal Revenue Code and whether such reporting would require prior approval by the IRS Commissioner as a change in method of accounting.

For the following reasons it is concluded that plaintiffs' attempted amended reporting of losses attributable to the terminated A–12 Contract on the basis of its completion in 1991 is not sanctioned by the applicable law, but any such reporting, if so sanctioned, would require prior approval by the Commissioner.

## FACTS

The parties have stipulated the facts relevant to a ruling on the Count I issues presented and the following is derived therefrom.

In 1984, and for years prior to that, General Dynamics was engaged in the development, manufacturing, and integration of major air combat systems through its Fort Worth Division. Commencing in 1984, the Department of the Navy initiated the A–12 "Advanced Tactical Aircraft Program" and asked four defense contractors to form teams to compete for an A–12 studies contract. McDonnell Douglas Corporation and General Dynamics Corporation agreed to bid as a team and between 1984 and 1988 performed concept formulation and demonstration and validation work pursuant to contracts awarded by the Navy with respect to the A–12 program. In September 1987, the McDonnell Douglas—General Dynamics team submitted a Best and Final Offer, for an A–12 Full Scale Engineering and Development Contract ("FSED Contract"). The A–12 FSED Contract was awarded to the McDonnell Douglas—General Dynamics team by the Navy on January 13, 1988, and provided that each team member "shall be jointly and severably liable for all obligations of this contract."

The 1988 A–12 FSED Contract was an incrementally funded, fixed-price incentive contract with a ceiling price of $4,777,330,294 and a target price of $4,379,219,436. The contract comprised fifty-eight contract line items identifying tasks to be performed, and required the team to produce eight FSED aircraft. Option provisions in the contract provided for the delivery of production aircraft in four lots, including Lot I (six aircraft) and Lot II (eight aircraft). The Navy exercised the Lot I option on May 31, 1990.

On December 17, 1990, the Navy issued a cure notice to the team, asserting that their failure to meet contract specifications and slippage in the contract schedule were endangering performance of the A–12 FSED Contract. The team was warned that a failure to cure these deficiencies by January 2, 1991 might result in termination of the contract for default. On December 31, 1990, the team submitted certified claims to the Navy for equitable adjustments to the A–12 FSED Contract totaling $1,401,181,205. The team also responded to the Navy's cure notice by a letter dated January 2, 1991. On January 7, 1991, the Navy's Contracting Officer issued a letter to the team stating that they were in default of the A–12 FSED Contract and that the Government was terminating the contract "... in accordance with FAR Clause

52.249–8, 'Default (Fixed–Price Supply and Services)' and [FAR Clause] 52.249–9, 'Default (Fixed–Price Research and Development).'" The Navy's letter also stated that, "The Team's right to proceed further under Contract N00019–88–C–0050 [the A–12 FSED Contract] is terminated immediately upon receipt of this letter."

Upon receipt of the January 7, 1991 termination letter, the team halted performance of the A–12 FSED Contract. General Dynamics terminated most of its employees who worked on the A–12 program, maintaining a limited number to assist in the close-out effort. The assets of the A–12 program were gathered, inventoried and stored in secured areas to the extent possible. The team sold, returned for credit, transferred to other Government programs or otherwise disposed of the A–12 program assets. Stop work orders were issued to all A–12 program subcontractors and suppliers, and termination settlement proposals were requested from each A–12 subcontractor. General Dynamics informed each A–12 subcontractor and supplier that "a restart of your contract is not anticipated." General Dynamics subsequently sold substantially all of the assets of its total military aircraft business to Lockheed Corporation, including the facility that had housed the A–12 program effort.

In conjunction with the termination of the A–12 Contract on January 7, 1991, the Government did not obligate $553 million in A–12 FSED funds scheduled for obligation on that date. A–12 production line money (about $30 million) was removed from the fiscal year 1992 budget. The Navy withdrew its on-site employees from the team's A–12 program facilities and transferred A–12 personnel to a different program. On February 5, 1991, the Navy issued a formal demand for the return of unliquidated progress payments, in excess of $1,300,000,000, made to the team during the performance of the A–12 FSED Contract. Contract modifications were issued which "de-obligated" the A–12 FSED Contract funds in the amount of $2,311,525,448.31. A–12 FSED and production appropriations were deleted from the Department of Defense and Congressional Budgets for the Fiscal Year 1992. The Government never re-let the A–12 FSED Contract.

In June of 1991, the team filed suit in this court, Docket No. 91–1204 C, contending that the default termination of the A–12 FSED Contract was not justified. Pursuant to FAR § 52.249–8(g) and FAR § 52.249–9(g), the team sought conversion of the default termination to a termination for the convenience of the Government with the monetary relief provided pursuant to FAR § 52.249–2. The team sought a judgment against the United States in an amount in excess of $1,200,000,000 plus interest. Also, in June of 1991, the team submitted a certified termination for convenience proposal and claim to the Government, using the total cost method, for FSED Lots I and II. In this contract litigation, the Government defends the default termination of the A–12 FSED Contract and asserts that the team owes the Government unliquidated progress payments in an amount in excess of $1,300,000,000 plus interest accrued since the demand letter was sent on February 5, 1991. This A–12 Contract litigation, Docket No. 91–1204 C, is actively pending.

On September 15, 1992, September 14, 1993, and September 15, 1994, General Dynamics timely filed consolidated federal income tax returns for the taxable years ending December 31, 1991, through December 31, 1993. In these federal income tax returns for 1991–1993, General Dynamics treated the FSED, Lot I, and Lot II portions of the A–12 FSED Contract as three separate long-term contracts under 26 U.S.C. § 460 as follows:

| | Percentage of Completion Method of Accounting | Completed Contract Method of Accounting |
|---|---|---|
| FSED | 70% | 30% |
| Lot I | 90% | 10% |
| Lot II | 100% | 0% |

General Dynamics did not treat the A–12 FSED Contract as complete in 1991 in these 1991–1993 consolidated returns. During an IRS audit, General Dynamics asserted to an IRS examiner that it had erred on its original consolidated federal income tax returns for 1991, 1992, and 1993, in that in those returns, General Dynamics failed to treat the A–12 FSED Contract as completed in 1991.

The IRS Examination Division did not agree that the A–12 FSED Contract was completed in 1991. Upon appeal, the IRS Appeals Division upheld the Examination Division decision. On May 15, 2001, General Dynamics filed formal refund claims (amended returns) with the IRS for tax years ending in 1991, 1992, and 1993 on the basis that the A–12 FSED contract was complete for federal income tax purposes in 1991. The Commissioner of Internal Revenue refused to allow General Dynamics an overpayment on this basis, and this refund tax litigation then ensued.

## DISCUSSION

■ From 1977 through 1986, General Dynamics used the completed contract method ("CCM") for reporting federal income tax with respect to long-term contracts, such as those to develop and produce military aircraft. *Gen. Dynamics Corp. v. Comm'r*, 74 T.C.M. (CCH) 632, 1997 WL 588900 (1997). Under CCM, recognition of gross income from a long-term contract is generally deferred until the taxable year in which the contract is completed. Both costs and revenues properly allocable to the long-term contract are accumulated until the contract is completed. *Id.;* Treas. Reg. § 1.451–3(d)(1); *Spang Indus., Inc. v. United States,* 791 F.2d 906–08 (Fed.Cir.1986).

The Tax Reform Act of 1986, Pub.L. No. 99–514, § 804(a), 100 Stat.2085, added Section 460 to the Internal Revenue Code of 1954, providing for the gradual discontinuance of the CCM for reporting income of long-term contracts in favor of the percentage of completion method ("PCM"). Under the PCM, gross income for the taxable year includes the portion of the gross contract price which corresponds to the percentage of the entire long-term contract completed during the taxable year. Treas. Reg. § 1.451–3(c)(1); *Tutor–Saliba Corp. v. Comm'r,* 115 T.C. 1, 4, 2000 WL 976802 (2000).

As amended in 1987, (Pub.L. No. 100–203, § 10203(a)(1)-(2), Dec. 22, 1987) and 1988 (Pub.L. No. 100–647, § 5041(a)(1)-(2), Nov. 10, 1988) Section 460 of the Code provided for the PCM/CCM combination of methods employed by General Dynamics in its original federal income tax filings for 1991–1993 with respect to the A–12 FSED Long–Term Contract. The FSED portion of the A–12 Contract was entered into in January of 1988 so that 70% of the items with respect to this portion were to be taken into account under PCM and 30% under CCM. The Lot I option of the contract was exercised in May of 1990 and 90% of the items with respect to this option of six aircraft were to be taken into account under PCM and 10% under CCM. In its original 1991–1993 federal income tax filings, General Dynamics did not treat the A–12 FSED Contract as completed in 1991. The refund claims treat the A–12 FSED Contract as completed in 1991 with the effect that accumulated losses of $168,692,768 in 1991, $34,475,237 in 1992, and $20,216,285 in 1993 are recognized, resulting in claimed refunds of $57,355,541 for 1991, $11,721,580 for 1992, and $7,075,699 for 1993.

Treasury Regulation § 1.451–3(b)(2) in effect during the years at issue provided:

(2) Completion—(i) Final completion and acceptance–

(A) General Rule. Except as otherwise provided in the paragraph (b)(2), and in paragraph (d)(2), (3), and (4) of this section (relating to disputes), a long-term contract shall not be considered "completed" until final completion and acceptance have occurred. Nevertheless, a taxpayer may not delay the completion of a contract for the principal purpose of deferring Federal income tax.

(B) Completion determined on basis of all facts and circumstances. Final completion and acceptance of a contract for Federal income tax purposes is determined from an analysis of all the relevant facts and circumstances, including the manner in which the parties to the contract deal with each other and with the subject matter of the contract, the physical condition and state of readiness of the subject matter of the contract, and the nature of any work or costs remaining to be performed or incurred on the contract. In considering the manner in which the parties deal with the subject matter of the contract, any use of the primary subject matter of the contract by the purchaser (except for testing pur-

poses that produce no gross revenue, cost savings, or other substantial benefits for the purchaser) will be considered.

Pursuant to this "all facts and circumstances" test defendant asserts that the FSED A–12 Contract can not be considered completed in 1991 because the subject matter of the contract comprised aircraft which were not delivered. Further, defendant asserts lack of completed contract status because substantial disputes exist over whether the default termination was correct, requiring repayment to the Navy of unliquidated progress payments, plus interest, or whether the default termination is properly converted to one for the convenience of the Government, requiring payment to plaintiffs of incurred contract costs plus interest as required by law.

Plaintiffs, also relying on the "all facts and circumstances" test, claim the A–12 FSED Contract was completed in 1991 because, after termination there was no possibility the aircraft would be delivered and all other aspects of the contract, outside of existing disputes, were essentially completed. That is, the contract and appropriation obligations were removed, employees terminated, work-in-process disposed of, stop-work orders issued, etc. With respect to the substantial on-going disputes, plaintiffs note that Treas. Reg. § 1.451–3(b)(2)(vi) provides:

> (vi) Disputes. Completion of a long-term contract is determined without regard to whether a dispute exists at the time the taxpayer tenders the subject matter of the contract to the party with whom the taxpayer has contracted. See paragraphs (d)(2), (3) and (4) of this section.

Defendant's position that the subject matter of the contract remained "aircraft" after the contract was terminated, if correct, would mean that the A–12 FSED Contract could never be considered completed for federal income tax purposes. The "subject matter" would never be tendered to the Navy. The Navy did not, after termination of the contract, continue to procure A–12 aircraft. Accordingly, as the contracting parties brought the A–12 FSED Contract to a conclusion, except for the pending disputes, in 1991, it is concluded that the contract was "completed" for federal income tax purposes in 1991.

This conclusion does not, however, produce the result sought by plaintiffs. Plaintiffs' Motion for Partial Summary Judgment seeks a "judicial determination that the A–12 Contract was complete in 1991 under the completed contract method of accounting, thus entitling General Dynamics to deduct deferred losses in 1991, . . . ." Plfs.' Mot., filed May 16, 2005, pp. 1, 7, 24. While the A–12 FSED Contract is considered complete in 1991, this does not produce entitlement for deferred losses to be deducted in that year. Where disputes exist at the completion of a long-term contract employing the CCM, Treas. Reg. § 1.451–3(d)(2)(ii) provides:

> (ii) If the amount reasonably in dispute affects so much of the contract price that it is not possible to determine whether a profit (an excess of the gross contract price over the costs properly allocable to such contract) or loss (an excess of the costs properly allocable to the long-term contract over the gross contract price) will ultimately be realized on such contract, then no item of income or deduction which is properly allocable to such contract shall be included in or deducted from gross income in the taxable year in which such contract is completed (without such regard to such dispute).

If plaintiffs were to prevail in the pending separate contract litigation, Docket No. 91–1204 C, they would receive the incurred cost recovery provided by the convenience-termination provisions of the A–12 FSED Contract, plus very substantial interest thereon, as prescribed by the Contract Disputes Act, 41 U.S.C. § 611, from June 26, 1991 to date of payment. *See McDonnell Douglas Corp. v. United States*, 40 Fed.Cl. 529, 556 (1998), *rev'd*, 182 F.3d 1319 (Fed.Cir.1999); *James M. Ellett Const. Co. v. United States*, 93 F.3d 1537, 1547 (Fed.Cir.1996); *General Builders Supply v. United States*, 187 Ct.Cl. 477, 409 F.2d 246 (1969). On the other hand, unliquidated progress payments received by General Dynamics comprise a loan which may not be retained if the product to which the payment is related is not successfully produced. *Fairchild Indus., Inc. v. United States*, 71

F.3d 868, 873 (Fed.Cir.1996). Were plaintiffs not to prevail in this pending separate contract litigation, the additional cost of re-paying in excess of $1,300,000,000 plus interest in unliquidated progress payments made by the Navy is faced. Clearly, the very large amounts in dispute in this separate Docket No. 91–1204 C litigation affect so much of the contract payments under the provisions of the A–12 FSED Contract such that a determination as to the ultimate profit or loss status required for CCM reporting is not possible until the disputes are resolved.

It is concluded that the income and/or loss allocable to the CCM portion of the A–12 FSED Contract cannot be properly reported until the taxable year in which the separate pending contract disputes are resolved.

This result is not inconsistent with the ruling in *Guy F. Atkinson Co. v. Commissioner,* 814 F.2d 1388 (9th Cir.1987), a case in which the regulations at issue were also considered. In *Atkinson,* the Circuit Court affirmed a Tax Court ruling that a contractor utilizing the CCM who abandoned a tunnel construction project in 1974–75 when less than sixty percent of the job was completed, could not treat the contract as "completed" in 1974–75 and deduct its losses in its partnership returns for those years. The parties were in litigation over the abandonment of the project, but the Tax Court ruled that the "dispute provisions" of the Treasury Regulations did not apply because the contract was not completed. The Circuit Court ruled that "[a]bsent completion, only upon final resolution of the parties' claims by agreement or by authoritative decree can there occur termination of the contractual relationship as contemplated by the regulations." 814 F.2d at 1392. In *Atkinson,* the contract was not considered completed because the subject matter of the contract, the tunnel, was still required and the contract was re-let to another contractor for its completion. By contrast, the A–12 FSED Contract was never re-let and the Navy has not obtained any A–12 aircraft. Accordingly, the ruling in *Atkinson* illustrates that were the A–12 FSED Contract not treated as completed in 1991, deduction of losses would then await resolution of pending disputes. Also, in the instant case, given the magnitude of the separately

pending disputes concerning substantial monetary relief sought by either party under the A–12 FSED Contract, even if the contract is considered complete in 1991, deduction of losses must also await resolution of the contract disputes pursuant to the then controlling dispute provisions of the applicable Treas. Regs. § 1.451–3(d)(2)–(4). Other cases cited by the parties have been considered but are not deemed helpful in resolving the completion/deduction issue presented.

■ The partial summary judgment motions filed by the parties also address the question whether plaintiffs' May 15, 2001 attempt to file amended returns for 1991, 1992, 1993, on the basis that the A–12 FSED Contract was completed in 1991, is properly blocked by 26 U.S.C. § 446(e) together with Treas. Regs. §§ 1.446–1(a)(1) and 1.446–1(e). These provisions require prior IRS Commissioner approval for a change in method of accounting.

Plaintiffs argue that their tendered May 2001 amended returns merely corrected their prior "error" in filing original 1991, 1992, and 1993 returns, using the correct CCM/PCM proportions but not on the basis of A–12 FSED Contract completion in 1991. Plaintiffs assert that Commissioner approval is not required for a taxpayer to correct an erroneous application of its chosen method of accounting and correctly cite *Thompson–King–Tate, Inc. v. United States,* 296 F.2d 290, 293–94 (6th Cir.1961), among other cases, in support. (Pls'. Mot., filed May 16, 2005, p. 18).

Defendant responds, with respect to *Thompson–King–Tate,* "that this 44 year old opinion from the Sixth Circuit is an aberration." (Def.s' Br., filed July 8, 2005, p. 19). Defendant relies mainly on the text of the Treasury Regulations and the ruling in *Diebold, Inc. v. United States,* 891 F.2d 1579, 1583 (Fed.Cir.1989) to support its position that prior Commissioner approval for plaintiffs' May, 2001 filing was necessary.

Treasury Reg. § 1.446–1(a)(1) provides that, "the term 'method of accounting' includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item."

Treasury Reg. § 1.446–1(e)(2)(ii)(a) provides that, "[a] change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. . . . A material item is any item which involves the proper time for the inclusion of an item in income or the taking of a deduction."

Treasury Reg. § 1.446–1(e)(2)(ii)(b) provides that " . . . a change in method of accounting does not include adjustment of any ·item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction."

In *Diebold*, the Federal Circuit ruled that the Claims Court was correct in its decision that the treatment of an item was a change in method of accounting because it involved the proper time for the inclusion of the item in income or the taking of a deduction. The Circuit Court stated that, "Section 446(e) prohibits taxpayers from unilaterally amending their tax returns simply because they have discovered that a different method of accounting yields a lower tax liability than the method they originally chose." 891 F.2d at 1583.

Since plaintiffs' proposed May 2001 amendments clearly concern the proper time for the inclusion of deductions for asserted losses, Code Section 446(e) and Treas. Reg. § 1.446–1(e) require prior Commissioner approval for their submission, as set forth in *Diebold*, 891 F.2d at 1579, a precedent which is controlling on this matter, unlike a decision by the Sixth Circuit.

### CONCLUSION

For the foregoing reasons it is **ORDERED** that:

(1) Defendant's Motion for Partial Summary Judgment, filed April 4, 2005, shall be **GRANTED** with respect to Count I of the Complaint, to the extent that, notwithstanding the completed status of the A–12 FSED Contract in 1991, deduction of losses in that year and thereafter until resolution of the substantial outstanding contract disputes is precluded by Treas. Regs. § 1.451–3(d)(2)–

(4) together with Code § 446(e) and Treas. Reg. § 1.446–1(e);

(2) Plaintiffs' Motion for Partial Summary Judgment, filed May 16, 2005, as to Count I of the Complaint shall be **DENIED**; and

(3) On or before February 28, 2006, counsel shall confer and then file a status report(s) indicating the proceeding(s) proposed for obtaining the resolution of the remaining issues involved in this litigation.